United States Court of Appeals
Fifth Circuit

**F I L E D**

June 1, 2006

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 04-51006

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LIDIA ROJAS ALVAREZ; HUMBERTO PINON,

Defendants-Appellants.

_____

Appeal from the Unites States District Court
for the Western District of Texas

_____

Before GARWOOD, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge.

In this action, two co-defendants appeal their convictions. We vacate all counts of conviction as to one defendant. As to the other defendant, we vacate three counts of conviction and remand with instructions to enter convictions on the lesser-included offenses and to resentence. In all other respects, we affirm.

## I. FACTS AND PROCEEDINGS

Lidia Alvarez ("Alvarez") and several members of her extended family sold heroin and cocaine in Midland, Texas. Adam Alvarez ("Adam"), Alvarez's grandson, was a street-level dealer, who

- 1 -

obtained his supply from Alvarez. In November 2002, the Midland Police Department ("MPD") executed a controlled buy of heroin from Adam. Following the buy, MPD performed a consensual search of Adam's home, at 1306 Carrizo, and discovered quantities of heroin and cocaine. Adam was not arrested at that time. He agreed to cooperate with MPD and the Drug Enforcement Agency ("DEA"), but did not provide useful information. Adam's girlfriend, Maria Lira ("Lira"), lived with Adam and, occasionally, facilitated drug transactions.

In August 2003, MPD engaged in a series of controlled buys. A confidential source, Jeffery Coffee, was used to purchase heroin from members of the Alvarez family. MPD Detective Ed Marker assisted with the controlled buys. In addition to buying from Adam, Coffee made buys from Domingo Alvarez ("Domingo"), Alvarez's son and a street-level dealer. Coffee also bought heroin from Mario Alvarez ("Mario"), another of Alvarez's grandsons. For all of the controlled buys, MPD recorded the serial numbers of the money used.

Before one controlled buy, Coffee, using a recorded telephone, asked Adam for four grams of heroin. Adam informed Coffee that he only had two grams and that, if Coffee wanted all four grams, Adam would have to get more. Adam told Coffee that his grandmother, *i.e.*, Alvarez, was not at home and that Coffee would have to wait until she returned to get the full amount. Following the call, MPD observed Adam leave his home and proceed to Alvarez's home, at 4615 Cherokee. MPD was unsure whether Alvarez was home, but observed her car at the scene. MPD saw Adam leave the residence with Mario. Both Adam and Mario proceeded directly to the pre-arranged location, and Coffee purchased four grams of heroin from Adam. Telephone records revealed that Adam called Alvarez one minute after Coffee's call to Adam; one minute later, according to those records, Adam called Coffee. The time of the calls corresponds with the time Adam left his house

- 2 -

for Alvarez's residence. The entire operation took forty-five minutes.

On August 27, 2003, MPD, including Detective Marker, executed a search warrant at the new residence of Adam and Lira, 3804 Anetta, and Alvarez's residence, 4615 Cherokee. MPD found both heroin and cocaine at 3804 Anetta. The 4615 Cherokee search also produced drug paraphernalia and documents indicative of drug distribution. Alvarez and Domingo were present at 4615 Cherokee during the search. MPD found heroin on Domingo's person. In addition, over $6000, including some bills from at least two of the controlled buys, was found in Alvarez's purse.

On January 21, 2004, a grand jury indicted Alvarez, Adam, Domingo, and Mario on a multitude of drug and conspiracy charges. On January 30, 2004, MPD and DEA executed additional search warrants at 4615 Cherokee and 3804 Anetta. Lira assisted MPD and DEA in the searches of both locations; she identified places throughout the residences where contraband was hidden . At both residences, the officers found heroin and cocaine. During the searches, Lira told the investigators that more drugs were hidden in the residence of Humberto Pinon ("Pinon"), Alvarez's husband.

MPD and DEA proceeded to Pinon's residence, a trailer at 2005 South Ft. Worth. After MPD and DEA located Pinon at his place of work, he returned with the officers and consented to the officers' warrantless search of his trailer. During the search, the officers looked behind a large piece of wood that was placed against the trailer's bathroom wall. Behind the piece of wood, the officers discovered a space in the bathroom wall. Inside the space was a pair of boots, and inside the boots were heroin, cocaine, an envelope with over $14,000, and a check for $5,000 made out to Alvarez. On a bed in the trailer among unopened mail, the officers also found an empty plain white envelope, of the same type as that containing the $14,000; on the envelope was written "$2,000."

On February 18, 2004, the grand jury returned a superseding indictment. Pinon was added to the list of indicted persons and was charged with conspiracy and two counts of aiding and abetting possession with intent to distribute within 1000 feet of a school. Ultimately, only Alvarez and Pinon were tried on the indictment.[1] The jury acquitted Alvarez on Count One (conspiracy to possess with intent to distribute and to distribute heroin within 1000 feet of a playground and a school) and convicted her on Count Eight (aiding and abetting distribution of heroin within 1000 feet of a playground), Count Twelve (possession with the intent to distribute heroin within 1000 feet of a playground), Count Thirteen (possession with the intent to distribute cocaine within 1000 feet of a playground), Count Fifteen (aiding and abetting possession with the intent to distribute heroin within 1000 feet of a school), and Count Sixteen (aiding and abetting possession with the intent to distribute cocaine within 1000 feet of a school). The jury acquitted Pinon on Count One and convicted him on Count Fifteen and Count Sixteen. At sentencing, the district court, imposed a sentence of ninety-seven months imprisonment (and 144 months supervised release) on Alvarez and a sentence of fifty-seven months imprisonment (and seventy-two months supervised release) on Pinon.

Before trial, Alvarez filed motions to suppress evidence obtained pursuant to the two search warrants; both motions were denied. Alvarez and Pinon also both timely filed motions for judgment of acquittal; those motions were also denied. Both timely appealed.

## II. DISCUSSION

**A.    Sufficiency of the evidence to support Alvarez's convictions for committing drug offenses "within 1000 feet of a playground"**

Counts Eight, Twelve, and Thirteen of the superseding indictment each involve drug activity

---

[1]All of the charges were alleged violations of some combination of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) & (C), 846, 860 and 18 U.S.C. § 2.

within 1000 feet of a playground in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) & (C), 860 and 18 U.S.C. § 2. Under § 860, an offender is subject to "twice the maximum punishment" in the event the substantive violation is in, on, or within 1000 feet of a playground. 21 U.S.C. § 860(a). The same provision supplies a statutory definition for the term playground: "The term 'playground' means any outdoor facility (including any parking lot appurtenant thereto) intended for recreation, open to the public, and with any portion thereof containing three or more separate apparatus intended for the recreation of children including, but not limited to, sliding boards, swingsets, and teeterboards." 21 U.S.C. § 860(e)(1). The Government elicited testimony to the effect that drug activity took place within 1000 feet of Beal Park and Kelly Park in Midland, but did not introduce evidence about the existence of any child-play apparatus contained in either park. The jury found that the Government proved, beyond a reasonable doubt, that the drug activity took place within 1000 feet of the parks, as the indictment alleged, but made no specific findings on the existence of child-play apparatus.[2] At oral argument, the Government could not identify any evidence submitted to the jury indicating the existence or number of child-play apparatus contained in either park.

This court reviews a district court's denial of a post-trial motion for a judgment of acquittal de novo. *United States v. Bellew,* 369 F.3d 450, 452 (5th Cir. 2005) (citing *United States v. Greer,* 137 F.3d 247, 249 (5th Cir. 1998)). In a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*

---

[2]Indeed, the jury was not asked to make such findings; the indictment alleged only drug activity "within 1000 feet of the real property comprising playgrounds, specifically, Kelly and Beal Park in Midland, Texas." Counts Twelve and Thirteen were limited to Beal Park, but used the same language.

*v. Virginia*, 443 U.S. 307, 319 (1979). *See also United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir.), *cert. denied*, 126 S. Ct. 672 (2005). In conducting this review, this court does not question the veracity of the Government's evidence: "[B]ecause the evidence must be viewed in the light most favorable to the verdict, the evidence offered by the prosecution should be assumed to be true." *Lopez-Urbina*, 434 F.3d at 757 (citing *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997)). "While the jury is free to choose among reasonable constructions of the evidence, [i]f the evidence . . . gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999) (internal citations and quotations omitted) (alterations in original). Nevertheless, the court does "'not consider whether the jury correctly determined guilt or innocence, [only] whether the jury made a rational decision.'" *Lopez-Urbina*, 434 F.3d at 757 (quoting *United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002)) (alteration in original).

**(1)   "Playground" element**

Alvarez contends that "playground" is an essential element of the crime and, under *Jackson*, the Government must prove beyond a reasonable doubt that the statutory definition of "playground" is met. Because the Government failed to prove this element, according to Alvarez, the district court's failure to direct a judgment of acquittal is reversible error.

The Government directs the court to DEA Agent Dean Cook's testimony, in which Agent Cook testified that the 4615 Cherokee residence was within 1000 feet of the property comprising Beal Park, in Midland. Agent Cook's testimony is supported by MPD Sergeant Russell's testimony to the same effect. The officers' testimony clearly supports the jury verdict that the drugs were

located within 1000 feet of Beal Park, but gives no indication that the park qualifies as a "playground" as Congress defined the term. The Government acknowledges that other circuits have ruled in the manner urged by Alvarez, but states that, under this court's precedent, the Government proved enough. We disagree.

This court has expressly held that "21 U.S.C. § 860 is a substantive offense rather than merely a sentence enhancer of 21 U.S.C. § 841(a)(1)." *United States v. Chandler*, 125 F.3d 892, 896 (5th Cir. 1997). In reaching its conclusion, the *Chandler* court pointed out that its position was "in accord with the position of virtually every other court of appeals, which 'have uniformly held [that] § 860 is a separate offense that requires proof of an element that is not listed in § 841.'" *Id*. (quoting *United States v. McQuilkin*, 78 F.3d 105, 109 (3d Cir. 1996) (collecting cases)). The Fourth, Sixth, Ninth, Tenth, and Eleventh Circuits each require that the Government satisfy, beyond a reasonable doubt, the statutory definition of "playground" as provided in § 860(e)(1). *See, e.g., United States v. Migi*, 329 F.3d 1085, 1087 (9th Cir. 2003) ("The Government must prove four elements to meet the definition of a 'playground': (1) that the area is an outdoor facility, (2) that the area is intended for recreation, (3) that the area is open to the public, and (4) that the area includes three or more separate apparatus intended for the recreation of children."); *United States v. Horsley*, 56 F.3d 50, 51–52 (11th Cir. 1995) (affirming a conviction where the evidence was sufficient to establish that the elements of the definition of "playground" as established by Congress were met); *United States. v. Clanton*, 32 F.3d 569 (6th Cir. 1994) (table) ("From these facts, a rational trier of fact could conclude, beyond a reasonable doubt, that the playgrounds in issue were open to the public, within the contemplation of the statute."); *United States v. Parker*, 30 F.3d 542, 552 (4th Cir. 1994) ("Congress chose to define the term in a specific manner and, consequently, proof must be adduced

in order to sustain a jury's conclusion that a playground was involved."); *United States v. Smith*, 13 F.3d 380, 382–83 (10th Cir. 1993) (reversing a conviction because, in the absence of evidence relating to the park's child-play apparatus, "[a]n element of th[e] offense was not proven").

In the face of the statute's plain language and this uniform application of § 860, the Government suggests that this circuit does not require the same quantum of proof. In an unpublished opinion, *United States v. Taylor*, 254 F.3d 71 (5th Cir. 2001) (table) (per curiam), this court held that a Government witness's testimony that he "bought cocaine from [the defendant] on two different occasions and that one of the transactions took place within 1,000 feet of a playground" was sufficient evidence to support a conviction under 21 U.S.C. § 860. Aside from the fact that *Taylor* is not binding on this court, it is not as sweeping as the Government contends. *Taylor*'s holding indicates that the panel was satisfied that the evidence produced met the constitutional minimum required, but there is no indication of the specifics of the challenge or whether the statutory definition of "playground" was even at issue.

Even viewing the evidence in the light most favorable to the verdict, no rational trier of fact could have found beyond a reasonable doubt that Alvarez's drug activity took place within 1000 feet of (1) an "outdoor facility," which is (2) "intended for recreation," (3) "open to the public," and also (4) contains "three or more separate apparatus intended for the recreation of children." 21 U.S.C. § 860(e)(1). We join the many other circuits to consider the issue and hold that the congressional definition of playground must be proven as an element of a § 860(a) offense. Accordingly, we vacate Alvarez's convictions as to Counts Eight, Twelve, and Thirteen to the extent they involve violations of § 860.

**(2)    Lesser included offense**

"In certain limited circumstances, we may exercise our power under 28 U.S.C. § 2106 and reduce a conviction to a lesser included offense." *United States v. Hunt*, 129 F.3d 739, 744 (5th Cir. 1997). *See also Rutledge v. United States*, 517 U.S. 292, 306 (1996) (noting "with approval" that "federal appellate courts appear to have uniformly concluded that they may direct the entry of judgment for a lesser included offense [under 28 U.S.C. § 2106] when a conviction for a greater offense is reversed on grounds that affect only the greater offense"); *United States v. Skipper*, 74 F.3d 608, 611–12 (5th Cir. 1996) (employing § 2106 to remand to the district court for an entry of judgment on a lesser included offense). This circuit has outlined the appropriate circumstances to invoke § 2106:

> "It must be clear (1) that the evidence adduced at trial fails to support one or more elements of the crime of which appellant was convicted, (2) that such evidence sufficiently sustains all the elements of another offense, (3) that the latter is a lesser included offense of the former, and (4) that no undue prejudice will result to the accused."

*Hunt*, 129 F.3d at 745 (quoting *Allison v. United States*, 409 F.2d 445, 451 (D.C. Cir. 1969) (cited with approval in *Rutledge*, 517 U.S. at 305 n.15)).

Given our resolution of the "playground" issue, the first prong has been met. Further, as only the "playground" element went unproven, the second element is met because the evidence presented is sufficient to support a violation of 21 U.S.C. § 841(a) (making it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance"). The third prong is met because § 841(a) is a lesser included offense of § 860(a). *United States v. Scott*, 987 F.2d 261, 266 (5th Cir. 1993) (discussing the predecessor statute to § 860). *See also United States v. Phillips*, 382 F.3d 489, 499 (5th Cir. 2004) (stating, in a sentencing context, that § 841 is a lesser included offense of § 860);

*Parker*, 30 F.3d at 553 ("Section 841(a) is a lesser included offense of § 860(a).") (citing both Fourth and Eleventh Circuit precedent). Alvarez does not dispute the drug-related aspects of her convictions for these counts. As a result, her convictions for proven lesser included offenses are not unduly prejudicial. *Hunt*, 129 F.3d at 745 (quoting *Smith*, 13 F.3d at 383).

We hold that, in rendering its verdict, the jury found that Alvarez twice violated § 841(a)(1) and once aided and abetted a violation of § 841(a)(1). We therefore remand for the entry of judgment accordingly and for resentencing.[3]

**B.     Sufficiency of the evidence to support Alvarez's convictions for committing drug offenses "within 1000 feet of a school"**

Counts Fifteen and Sixteen of the superseding indictment each involve drug activity within 1000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1) (B) & (C), 860 and 18 U.S.C. § 2. Alvarez contends that, despite testimony from several witnesses that the drug activity took place within 1000 feet of local schools, the Government failed to sufficiently prove the 1000-foot element of the crime. In Alvarez's view, because the testimony was limited to assertions that the distance was less than 1000 feet, and not reduced to a specific distance, the jury could not reasonably infer that the schools were within 1000 feet of the drug activity as required under 21 U.S.C. § 860(a). Further, Alvarez suggests that the evidence is deficient because the witnesses testified that the properties where the activities took place, not the actual drugs, were within 1000 feet of the schools.

Under the standard of review previously set out, Alvarez's challenge fails. In *United States v. Sparks*, this court rejected a similar claim when trial testimony provided that the locus of the drug

_____

[3]At sentencing, Alvarez objected to the district court's determination of her sentencing range by using a weight of narcotics not proven to a jury. The Government concedes reversible error under *United States v. Booker*, 543 U.S. 220 (2005). But because we vacate and remand Alvarez's sentence on alternative grounds, we do not reach Alvarez's *Booker* argument.

activity "was located within 1,000 feet of [a] school." 2 F.3d 574, 580 (5th Cir. 1993). And Alvarez identifies no circuit precedent requiring the distance be identified with more particularity than simply "within 1000 feet;" indeed, the statute requires nothing more. As Alvarez concedes, several Government witnesses testified that the relevant drug activity took place within 1000 feet of local schools. The repeated testimony that the drug activity took place "within 1000 feet" of a school is obviously sufficient for a reasonable jury to conclude just that. We affirm Alvarez's convictions with respect to Counts Fifteen and Sixteen.

**C. Motions to suppress evidence obtained pursuant to the August 24, 2003, and January 28, 2004, search warrants**

The Government obtained all of the physical evidence used in trial while executing two search warrants, which were issued by different judges on or about August 24, 2003, and January 28, 2004, respectively. Alvarez moved the district court to suppress the evidence obtained through these warrants; both motions were denied by the district court. On appeal, Alvarez again contends that both warrants were deficient and that the evidence obtained must be suppressed.

When this court reviews a district court's denial of a suppression motion, conclusions of law are reviewed de novo and findings of fact for clear error; moreover, the court views the evidence "in the light most favorable to the prevailing party." *United States v. Gibbs*, 421 F.3d 352, 356–57 (5th Cir. 2005) (citing *United States v. Dortch*, 199 F.3d 193, 197 (5th Cir. 1999)). When considering a challenge to a search made pursuant to a warrant, this court employs a two-part test: "First, the court determines whether the good-faith exception to the exclusionary rule applies; if it does not, it must ascertain whether the warrant was supported by probable cause." *Id.* at 355 (internal quotations omitted).

Evidence obtained pursuant to "objectively reasonable reliance on a warrant" will not be

suppressed "even if the warrant is subsequently invalidated." *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). An officer's reliance on the warrant is not objectively reasonable and, therefore, not entitled to the good-faith exception to the exclusionary rule if: (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) an officer "relies on a warrant based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Cherna*, 184 F.3d at 407–08 (internal citations and quotations omitted).

**(1)      The August 24, 2003, warrant**

Alvarez challenges the August 24 warrant on only the first circumstance described above. Alvarez argues that Detective Marker's statement in the affidavit—that Adam told the confidential source, Coffee, that Adam "would have to get with his grandmother" to get additional heroin for the controlled buy—was known to Detective Marker to be untrue or was made with reckless disregard for the truth. Alvarez supports this claim by reference to the recording of the telephone conversation between Coffee and Adam.

At the suppression hearings, the Government contended that contents of the recording confirmed that Adam referred to Alvarez as his source of heroin. The magistrate judge and the district court both agreed with the Government. In a review by both courts, the judges each independently made a factual finding that Adam had audibly referred to his grandmother, *i.e.*, Alvarez,

- 12 -

in the taped conversation.[4] Both judges, in addition, found that, regardless of the tape's content, Detective Marker had a "good faith belief" to include the references to Alvarez in the affidavit.

Leaving aside the tape's contents, the surrounding circumstances of the investigation support Detective Marker's good-faith belief that Adam was, in fact, referring to Alvarez in the calls with Coffee. Immediately after Adam stated that he needed to obtain additional heroin to fill Coffee's order, Adam called Alvarez. After the call to Alvarez, Adam called Coffee back and informed him that Adam could fill the order, but that Coffee would have to wait until "she" was ready. Coffee, who actually participated in the recorded calls, told Detective Marker, at the time the calls were placed, that Adam "would have to get ahold [sic] of his grandmother" to get the two additional grams of heroin. Police surveillance confirmed that Adam traveled directly from his home to Alvarez's home at 4615 Cherokee and then to the prearranged location of the buy. Detective Marker also confirmed, before obtaining the warrant, that Alvarez actually owned 4615 Cherokee.

Detective Marker based his statements in the affidavit on all of the facts derived in the investigation, including, but not limited to, the taped conversation. Testifying during the suppression hearing, Detective Marker was asked, "You're basing the belief that you described a while ago [*i.e.*, Adam's reference to Alvarez] on the phone call, the information you received and what surveillance observed; is that correct?" He responded, "Correct." Detective Marker also clarified that the taped conversation was used to confirm his understanding that Adam referred to Alvarez during the conversation with Coffee. He was asked, "Did you confirm [what] the informant told you with the

---

[4]The sound quality of the tape is poor, and the words are sometimes inaudible. It is not clear to this court that Adam said either "grandmother," "granny," or any such variation of the term in the call. However, Adam was clearly talking about a woman. Because of the alternative basis for finding good faith, we make no assessment of the district court's factual determination of the tape's contents.

conversation that you heard on the audio?" Detective Marker responded, "Yes."

Even if the taped conversation does not indicate that Adam used the word "grandmother" or the like, Coffee's description of the conversation and the results of the police surveillance, all of which formed Detective Marker's belief that Adam was referring to Alvarez as his source of heroin, taken together and viewed in the light most favorable to the Government do not result in "the definite and firm conviction that a mistake has been committed." *United States v. Andrews*, 22 F.3d 1328, 1333 (5th Cir. 1994). We have no basis to disagree with the district court's finding that Detective Marker had a good faith belief that Adam referred to Alvarez. It follows, then, that the good-faith exception to the exclusionary rule applies. Even if the good-faith exception did not apply, the search is valid because, without Adam's reference to Alvarez, the affidavit sets out a sufficient basis to find probable cause that drugs or evidence of drug trafficking were located at 4615 Cherokee. *See United States v. Cisneros*, 112 F.3d 1272, 1279 (5th Cir. 1997) (finding an affidavit sufficient to establish probable cause where it "furnished adequate 'information to allow the conclusion that a fair probability existed that seizable evidence would be found'") (quoting *United States v. Restrepo*, 994 F.2d 173, 189 (5th Cir. 1993)). Accordingly, the district court did not err in denying Alvarez's motion to suppress. For these reasons, we affirm the district court's denial of Alvarez's motion to suppress the evidence from the August 24 warrant.

**(2)    The January 28, 2004, warrant**

Alvarez challenges the January 28 warrant on the ground that the affiant, DEA Agent David Salmon, could not have reasonably believed that the information contained in the affidavit was sufficient to show probable cause. Alvarez's main argument is that, during Agent Salmon's testimony to the grand jury before Alvarez and her family members were indicted, Agent Salmon stated that the

- 14 -

information possessed at the time was too stale to support a search warrant. Alvarez suggests that, because Agent Salmon believed the information in the affidavit was stale, he could not have reasonably believed the warrant was sufficient to show probable cause. In addition, Alvarez maintains that, in light of Agent Salmon's reliance on an anonymous tip without sufficient corroboration, Agent Salmon could not have reasonably believed that the affidavit showed probable cause. Alvarez conflates the first and third good-faith exceptions to the exclusionary rule.

The first exception does not apply because Alvarez does not contend that Agent Salmon misled the issuing judge by placing information in his affidavit that he "'knew was false or would have known was false except for his reckless disregard of the truth.'" *Cherna*, 184 F.3d at 407 (quoting *Leon*, 468 U.S. at 923). At best, Alvarez's complaint is that Agent Salmon did not believe that the facts supported a legal finding that probable cause existed—the first exception does not encompass such an argument.

Nor does the third exception provide Alvarez relief. Alvarez cites *United States v. Barrington*, 806 F.2d 529, 531 (5th Cir. 1986), for the proposition that an officer who executes a search warrant based his own "bare bones" affidavit cannot in good faith rely on the issuing judge's probable cause determination. But Agent Salmon's affidavit was much more than "bare bones" and the information contained in it exceeded that which Agent Salmon had earlier described as stale.

On the issue of staleness, this court previously has identified two issues of significance: (1) Information reaching back over long periods may be used to support an affidavit "if the information of the affidavit clearly shows a long-standing, ongoing pattern of criminal activity;" and (2) where the type of evidence sought is "the sort that can reasonably be expected to be kept for long periods of time in the place to be searched," the court is "more tolerant of dated allegations." *United States v.*

*Pena-Rodriguez*, 110 F.3d 1120, 1130 (5th Cir. 1997) (internal quotations omitted). Both issues militate in the Government's favor.

Agent Salmon's affidavit showed that the Alvarez family had been involved in drug dealing since, at least, August 2003. Agent Salmon recounted the history of the controlled buys from the Alvarez family and of the positive search conducted during that time-frame. The significance of the anonymous tip is that it indicated that the drug-dealing operation did not stop after MPD executed the August 24 warrant. The tip informed that the same parties continued the same activity in the same location. Moreover, additional information, such as car-rental histories and border crossings into Ojinga, Mexico, was obtained after Agent Salmon stated that the information was stale. This new information also supported the view that the criminal activity was ongoing in nature. Finally, the warrant sought, *inter alia*, "documents and items which reflect drug trafficking activity." Agent Salmon's affidavit states, and his testimony confirms, that among the items he expected to find were books, records, receipts, and other historical proof of drug activity. This documentary evidence can reasonably be expected to be retained after it is obtained or created.

Turning to the issue of the anonymous tip, which informed the authorities that at least one member of the Alvarez family had returned to the drug trafficking business after the August search, Alvarez argues that it cannot support probable cause because it (1) was insufficiently corroborated and (2) did not predict "out-of-the usual activity which suggested criminal conduct." In support of her argument, Alvarez cites *Illinois v. Gates*, 462 U.S. 213 (1983), *Alabama v. White*, 496 U.S. 325 (1990), and *Florida v. J.L.*, 529 U.S. 266 (2000). Alvarez is incorrect on both of her assertions.

The law of this circuit is that "[t]here is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible." *United States v. Blount*, 123 F.3d

831, 836 (5th Cir. 1997) (en banc). Rather, "[w]hether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts." *Id.* This is not a situation, as in *Gates*, *White*, or *J.L.*, where the tip was the first piece of information that led the police to the suspect. Indeed, rather than requiring corroboration, the information in the tip corroborated the prior information and continuing suspicions of the authorities.

Before receiving the anonymous tip, MPD had established that members of the Alvarez family lived at 4615 Cherokee, had sold drugs from that location, and had kept both drugs and drug paraphernalia at that location. The information in the tip, which indicated that Domingo was dealing heroin on Cherokee Drive,[5] matched the ongoing pattern of criminal activity—drug trafficking by residents of 4615 Cherokee—of which the police previously were aware. Taking the information presented in the affidavit as a whole, the tip hardly required any additional corroboration because it fit with the preestablished pattern of criminal activity.

Nevertheless, the tip was sufficiently corroborated. The license plates were confirmed to match the descriptions of vehicles given by the informant; Domingo was identified as the registered owner of one of the vehicles, and his residence was listed as 4615 Cherokee. After that, MPD confirmed by surveillance and utility records that Alvarez still resided at 4615 Cherokee. All the details of the tip proved true, and the tip showed a continuation of the pattern of ongoing criminal activity.

For these reasons, we affirm the district court's denial of Alvarez's motion to suppress the evidence from the January 28 warrant.

---

[5]Alvarez's contention that the tip did not predict unusual activity indicative of criminal activity is meritless. The tip identified actual criminal activity—heroin trafficking.

**D.     Sufficiency of the evidence to support Pinon's convictions for aiding and abetting drug possession with intent to distribute**

At trial, Pinon was convicted of aiding and abetting the possession of heroin and cocaine with the intent to distribute within 1000 feet of a school. His sole challenge is to the sufficiency of the evidence in support of his convictions. Because the Government could not identify record evidence on which a rational trier of fact could rely to find every element of Pinon's charge satisfied, we vacate Pinon's convictions.

In order to obtain a conviction for aiding and abetting drug possession, the Government was required to prove several elements:

> To convict a defendant of possession with intent to distribute, the government must prove: (1) knowing (2) possession of an illegal substance (3) with the requisite intent to distribute. . . . For the government to prove guilt under an aiding and abetting theory, it must show that the defendant: (1) associated with a criminal venture; (2) participated in the venture; and (3) sought by action to make the venture successful. To be guilty of possession with intent to distribute, the defendant must have aided and abetted both the possession and the intent to distribute.

*United States v. Infante*, 404 F.3d 376, 385 (5th Cir. 2005) (internal citations omitted). *See also United States v. Hernandez-Bautista*, 293 F.3d 845, 853 (5th Cir. 2002). Of course, the evidence presented must allow the jury "to find every element of the offense beyond a reasonable doubt." *United States v. Redd*, 355 F.3d 866, 872 (5th Cir. 2003) (internal quotations omitted). A conviction must be overturned if it is based on speculation alone: "[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996). Accordingly, if the evidence presented, taken in the light most favorable to the Government with all inferences drawn favorably in support of the verdict, is not enough for any rational trier of fact to find every element satisfied beyond a reasonable

doubt, the convictions must be vacated. We hold that Pinon has met this stringent standard.

**(1)    Pinon's knowledge & the hidden compartment**

At argument, the Government and Pinon argued primarily over Pinon's knowledge about the cache of drugs and money hidden in his trailer. If Pinon was aware that the drugs and money were in his trailer, the Government's theory continues, Pinon must have committed the other elements of the charged offense.

The central theme of the Government's argument against Pinon on the knowing element of possession is that the drugs and money were located in the residence over which he exercised custody and control. This fact is not disputed. However, as the Government acknowledges, custody and control of a residence are not dispositive of knowledge of any narcotics located in that residence. *See United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993). And the Government concedes that where, as here, the contraband was secreted in a hidden compartment, this court requires additional evidence to prove the knowing element, such as a consciousness of guilt, conflicting statements, or an implausible account of events. *United States v. Rodriguez*, 993 F.2d 1170, 1175 (5th Cir. 1993). The Government fails in its attempt to identify inferences that a reasonable jury could draw from the testimony and evidence presented to meet this additional burden of showing Pinon's knowledge of the cache.

Having conceded that it bore the burden of producing additional evidence to show Pinon's knowledge because of the hidden nature of the contraband, the Government identified the following evidence in support of Pinon's convictions:  (a) Pinon was sometimes present at 4615 Cherokee during drug transactions and in a position to observe those transactions; (b) Pinon owned the trailer that had a hidden compartment; (c) The quantity of drugs and money were enough to infer Pinon's

- 19 -

knowledge; (d) Pinon's own statements indicate his knowledge; (e) Pinon gave Alvarez the key to the trailer; and (f) An envelope, marked "$2,000," of the same type as was found in the cache was found among unopened mail in the trailer. We consider the evidence to determine whether it supports Pinon's convictions.

### a.      Pinon's presence at 4615 Cherokee

Pinon contested that a jury could infer that he was aware of the Alvarez family's drug-trafficking history. Pinon did not dispute that he spent time at 4615 Cherokee; rather, he highlighted the fact that the testimony that placed him at the residence also showed his non-involvement in drug-trafficking activities. Still, the Government maintains, and we agree, that a jury could properly infer that Pinon knew about the Alvarez family's involvement with drugs. But his awareness of the family's dealing, alone, is not enough to infer that he was aware of the contraband hidden in his trailer.

### b.      The hidden compartment's existence

The Government's argument that the existence of the trailer's hidden compartment shows that Pinon knew about the compartment's contents is both circular and self-serving. To infer that Pinon was aware of the compartment's contents presumes that he was aware of the compartment's existence. But there is no evidence to that effect. Nor is there evidence that the compartment was created by or for Pinon for any illicit purposes. Indeed, the Government's argument would all but eliminate the knowledge requirement each time a hidden compartment merely existed. It is enough to note that we have required more than the existence of a hidden compartment to prove that a defendant knew about the compartment's contents.

### c.      The contraband's value

The Government cites *United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003), for the proposition that a significant value of contraband can be used to infer knowledge of possession. But *Villarreal* is distinguishable on key facts.[6] The *Villarreal* court did find additional evidence of knowledge, including the overall value of the narcotics. *Id*. at 324–25. The Government's evidence in *Villarreal*, however, was not limited to the value of the contraband alone; the defendant made conflicting statements to investigators with respect to both the circumstances of picking up the car containing the narcotics and his dealings with a co-conspirator. *Id*. at 325. In its final analysis, the *Villarreal* court focused more on the defendant's inconsistent statements than the weight of drugs in the car in concluding that circumstantial evidence supported his guilty verdict. *Id.* ("Villarreal's inconsistent statements, false exculpatory statements, and implausible explanations as to how he came to be hauling a vehicle loaded with marihuana, when combined with all the other evidence in the case, are more than sufficient circumstantial evidence of guilty knowledge.").

The facts of the instant case do not support the same inference. First, the contraband in the boot was valued at a fraction of the amount found in *Villarreal*. Second, there are no conflicting statements or actions indicative of a desire to mislead authorities. Because of the absence of additional circumstantial evidence and the disparity in the quantum of drugs found—both in terms of volume and value—we decline to extend *Villarreal* on the facts before us.

**d.     Pinon's statements**

---

[6]Of course, in *Villarreal*, the drugs were "not 'hidden' in the usual sense of being secreted in a hidden compartment." *Id.* at 324. Rather, the drugs—more than 600 pounds of marihuana—were in tape-wrapped bundles in plain view on the rear floorboards of a car the defendant was towing. *Id.* Nevertheless, the court looked for "additional circumstantial evidence of knowledge" because it was unclear whether the contents of the bundles would have been known to contain contraband. *Id.*

In its effort to establish Pinon's knowledge of the contents of the hidden compartment, the Government portrays Pinon as having made inconsistent statements or statements indicative of guilt. The Government's arguments find no support in the record. We need not highlight the Government's misconstrual of the record.[7] For the purposes of this opinion, it is enough to hold, as we do, that the record does not contain, and the Government cannot identify, any "inconsistent statements, false exculpatory statements, [or] implausible explanations," *Villarreal*, 324 F.3d at 325, made by Pinon from which a jury might infer that he was aware of the hidden contraband.

Despite the Government's arguments to the contrary, the record—including the testimony of the Government's witnesses—shows that Pinon appeared calm and cooperated fully with the police without question. There is simply no record evidence of wavering explanations, conflicting accounts, or nervous behavior from which a jury could infer Pinon's knowledge of the contraband's presence;[8]

---

[7]Most of the Government's arguments in this regard misstate the record. In its briefs, the Government advances several arguments about Pinon's awareness of the cache. For example, the Government first maintains that, because Pinon described himself as a "curious man," he had looked behind the wood panel to discover the boots and their contents. A cursory review of the transcript reveals that Pinon used the word "curious" to describe himself as odd, not as inquisitive. The Government also argues that "Pinon clearly knew there were drugs concealed in the trailer before the search took place" because he said "muchos problemos" when the police asked to search the trailer. In fact, the trial transcript provides that Agent Salmon testified that Pinon said "muchos problemos" *after* he saw the drugs and currency, *not before* as the Government argues in its brief. In addition, the Government looks to the fact that Pinon said "muchos problemos" as an acknowledgment of his complicity. But the true meaning of the statement—and its lack of probative value—were conceded at oral argument. These theories were largely abandoned by the Government at argument; none is supported by record evidence. We mention them only because the Government referred to its briefs at argument.

[8]The Government contends that Pinon's testimony shows equivocation from which a jury could infer an intent to cover his knowledge of the cache. At argument the Government confirmed that Pinon testified through an interpreter. The Government also conceded that Pinon's testimony was fractured and confused due to his inability to speak and understand English. Despite this concession, the Government contended that the jury could infer from Pinon's halting testimony that he was lying about his non-involvement. But we do not agree with the Government's position

- 22 -

none of Pinon's statements exhibit "characteristics of a 'consciousness of guilt.'" *Rodriguez*, 993 F.2d at 1176 (quoting *United States v. Diaz-Carreon*, 915 F.2d 951, 955 (5th Cir. 1990)).

**e.     The key to the trailer**

Next, the Government maintains that, because Pinon gave Alvarez the key to his trailer, the jury could infer that Pinon knew about the contraband in the trailer.  Pinon was married to Alvarez for seventeen years.  For a time, both Pinon and Alvarez lived in the trailer.  About two years before the events at issue transpired, Alvarez left the trailer to live at 4615 Cherokee; Pinon remained in the trailer without his wife.  Pinon testified, without contest, that he gave Alvarez the key to the trailer because she did his laundry.  The record also shows that Pinon and Alvarez were married when he gave her the key to the trailer.

At argument the Government conceded that Alvarez likely had a legal right to enter the trailer because the trailer was the community property of Alvarez and Pinon.  Moreover, the Government introduced no evidence to counter Pinon's explanation for giving Alvarez the key; the Government only *argued* that Pinon must have been aware of the ramifications of giving Alvarez the key to the trailer.  But argument is not evidence.  As Pinon's testimony about the circumstances of giving Alvarez the key went unchallenged, we do not believe that a rational jury could infer from the evidence presented that Pinon was aware of the contraband.

**f.     The envelope**

Finally, the Government refers to the empty envelope, which was found on a bed in the trailer

_____

that inconsistencies, which are admittedly caused by conditions unrelated to guilt, can be relied on to prove guilt.

along with some unopened mail.[9] Testimony indicates that the envelope was similar to other envelopes found in the boot and had "$2,000" marked on it. At argument the Government asserted that the jury could have inferred from the envelope's presence that Pinon knew about the cache. The Government's argument is that the jury could infer that, because of the envelope's presence in the open, the contraband's owner was not concerned that Pinon might become suspicious upon finding the envelope and that, because of the comfort level displayed by the contraband's owner, Pinon must have been aware of or involved with the use of his trailer by the contraband's owner. If the jury concluded that Pinon was aware of the presence of the contraband, the Government's argument continues, the jury could conclude that Pinon did knowingly aid and abet the possession with intent to distribute.

The Government attempts to cobble together inferences from the testimony presented in support of the verdict against Pinon. While a rational jury might make the chain of inferences described above, the relevant standard compels the convictions' vacatur. Leaving aside Pinon's theory of the case,[10] and based only on the evidence presented, the arguments made by the

---

[9]Neither the envelope in question nor those that were found in the boots were entered as record evidence. Two of the Government's exhibits (GX 10 & 11), prints of digital photographs, each show a small pile of mail. Some of the envelopes are opened, some are unopened. In neither photo is an envelope marked "$2,000" visible. Nor does any envelope in the piles of mail exhibit unique or memorable characteristics. The only identifiable addresses on the envelopes in the stacks are to Domingo Alvarez at 4615 Cherokee in GX 10 and to Lydia Alvarez at 4615 Cherokee in GX 11.

[10]Pinon claimed that Domingo placed the drugs and money in the hidden compartment without Pinon's knowledge. Domingo testified repeatedly that Pinon had no involvement in the drug activities of the Alvarez family. Domingo specifically testified that he personally hid the money and drugs in the boots without Pinon's knowledge. In response to a question about how the contraband came to be located in Pinon's trailer, Domingo replied, "Because I was going out of town, so I—I didn't know what to do with [the contraband]. I figured, nobody goes to [Pinon's] house, and he probably won't look, so that would be the best place to leave them at." Domingo went on to describe

Government, and the inferences that could be drawn from that evidence, a reasonable jury could not conclude *beyond a reasonable doubt* that the elements of the crime have been proven. *See United States v. Stewart*, 145 F.3d 273, 280 (5th Cir. 1998) ("The government's arguments require us to pile inference upon inference.") (citing *Pettigrew*, 77 F.3d at 1521). The nondescript envelope's presence in an illiterate man's trailer in a stack of mail containing letters addressed to Alvarez and Domingo at their 4615 Cherokee address simply is not enough to prove that Pinon knew the drugs were hidden in his trailer.

All other inferences draw from that first step; without Pinon's knowledge of the drugs, the Government's entire case against him unravels. In sum, when considering all of the Government's arguments together, we are not convinced that a reasonable jury could find beyond a reasonable doubt that Pinon knowingly aided and abetted the possession of the drugs. And the Government's unabashed attempts to recast the evidence on appeal only underscores the weakness of its case against Pinon. Because the evidence presented to the jury does not support a finding beyond a reasonable doubt, even when construed and with inferences in the Government's favor, we vacate Pinon's convictions.

**(2)     Association with and participation in a criminal venture**

how he accessed the trailer using the key from Alvarez's key chain. He further described the boots and the compartment in which he hid the contraband. When asked why he decided to hide the drugs and money in Pinon's bathroom, Domingo explained, "Because [Pinon] usually works—six days a week, and he's there by himself. I didn't think he would have any suspicions that something was in his house." The Government did not supply any evidence to counter Alvarez's theory of defense.

At the time Domingo testified, he had pleaded guilty for his part in the trafficking. He was warned by the district court that he could refuse to testify. He had little incentive to lie because he was awaiting sentencing, and his testimony ran counter to the Government's theory on Pinon. The Government attacked Domingo's credibility by introducing Domingo's factual basis from his plea agreement in which Domingo admitted that he conspired with Pinon among others in the drug distribution. Domingo testified that he never read the factual basis.

The Government correctly notes that express agreements are not necessary to show that a defendant shared the principal's criminal intent. *Infante*, 404 F.3d at 385. Nevertheless, the Government must, at a minimum, establish a "common purpose, design, and understanding." *Id*. To the evidence discussed above, the Government adds the observation that Pinon may have been an asset because he "was a man who had the ability to keep a low profile." Based on Pinon's "low profile," the Government argues that "the most logical inference to be drawn . . . demonstrates that Pinon tacitly agreed to allow the Alvarez family to use his trailer to store their contraband and money." However, the Government does not identify any actual evidence in support of an agreement or any common purpose, design, or understanding. The evidence cannot support a finding that Pinon associated with or participated in the criminal venture. For this reason, Pinon's convictions should be vacated.

**(3)    Affirmative conduct**

The Government also relies on Pinon's transfer of his key to Alvarez as evidence that Pinon "sought by action to make the venture successful." *Infante*, 404 F.3d at 385. The Government chiefly relies on *United States v. Garcia*, 242 F.3d 593, 597 (5th Cir. 2001), for the proposition that turning a key over to known traffickers is the requisite affirmative step. In *Garcia*, the court found that "assent . . . to the use of [one's] property for the storage of [narcotics] constitutes the requisite affirmative conduct to support his aiding and abetting conviction." *Id*. at 597. However, in addition to giving the traffickers the key, the defendant in *Garcia* also was certain that trafficking was taking place and, nevertheless, offered both his residence and advice on how to avoid detection. *Id*. at 596.

Here, the jury heard uncontradicted testimony that Pinon gave Alvarez the key so that she could deliver laundry to the trailer. And, of course, Pinon was still married to Alvarez; this simple

fact makes *Garcia* inapplicable. The Government never presented evidence from which a rationale jury could conclude beyond a reasonable doubt that Pinon sought by action to make the venture succeed. For this reason, Pinon's convictions should be vacated.

### III. CONCLUSION

We VACATE Alvarez's convictions as to Counts Eight, Twelve, and Thirteen of the superseding indictment and we REMAND with instructions to enter a conviction on each count for violations of 18 U.S.C. § 841(a). We further VACATE Alvarez's sentence and REMAND for resentencing. In all other respects, we AFFIRM Alvarez's convictions.

We VACATE Pinon's convictions.