UNITED STATES of America,
Plaintiff,

v.

Bruce E. COSTA, Jr., Defendant.

Crim. No. 10–047–SLR.

United States District Court,
D. Delaware.

Sept. 7, 2010.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

On April 15, 2010, a federal grand jury returned a one count indictment and notice of forfeiture against defendant Bruce E. Costa, Jr. for unlawful distribution of Oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (D.I. 3) Defendant has moved to suppress evidence seized during a search of his residence, asserting that the search warrant affidavit contained stale information and showed no nexus between the alleged unlawful activity and defendant's residence. (D.I. 19) The matter is fully briefed.[1] (D.I. 21, 26, 28, 29) The court has jurisdiction pursuant to 18 U.S.C. § 3231.

### II. BACKGROUND [2]

According to the affidavit, between June 2007 and September 2009, the Federal Bureau of Investigation ("FBI"), Delaware State Police ("DSP"), Office of Narcotics and Dangerous Drugs ("ONDD") and the Drug Enforcement Administration ("DEA") conducted an investigation into the illegal distribution of Oxycodone [3] in the Wilmington, Delaware area. The investigation revealed that two individuals, "MS" and "JS," were unlawfully purchasing and selling large quantities of Oxycodone 80 mg tablets.[4] The source of the pills was a third individual, "RT."

Zane Memeger, United States Attorney for the Eastern District of Pennsylvania; Michelle Rotella, Assistant United States Attorney for the Eastern District of Pennsylvania; and Shawn Weede, Special Assistant United States Attorney in the Eastern District of Pennsylvania. United States Attorney's Office, Eastern District of Pennsylvania, Philadelphia, PA, for Plaintiff, United States of America.

Edmund D. Lyons, Jr., Esquire of the Lyons Law Firm, Wilmington, DE, for Defendant, Bruce E. Costa, Jr.

1. Although the parties originally agreed that the motion was appropriate for disposition on the papers (D.I. 21), defendant subsequently filed a letter request for oral argument (D.I. 32). The request is denied, there being no novel issue of law presented.

2. Since the search warrant remains under seal, this background is drawn from the parties' public filings (D.I. 19, 21, 26, 28, 29).

The court, however, considered the warrant (D.I. 20), in its entirety, for purposes of resolving the motion at bar.

3. Oxycodone, available by prescription only, is a highly addictive painkiller that is illegally sold on the "street." (D.I. 26 at 3)

4. The court uses "tablets" and "pills" interchangeably.

On September 12, 2009, MS and JS were arrested. JS waived his Miranda rights and advised law enforcement agents that he and MS were involved in the unlawful distribution of Oxycodone and other prescription pills for the past six months to a year. MS and JS bought the pills from RT, who sold the pills in sealed, wholesale manufacturer's bottles. JS and MS paid $3,000 for each 100–tablet bottle. JS estimated that he and MS purchased a total of 100 of these wholesale bottles from RT.

In August and September 2009, DSP and FBI surveillance units observed RT meeting with defendant[5] in the parking lot of the Pharmacy. Specifically, on August 29, 2009, at approximately 11:06 a.m., RT was observed arriving at the Pharmacy. At 11:08 a.m., RT met defendant in the Pharmacy's parking lot. Defendant was observed giving RT a package from his vehicle. On September 5, 2009, at 8:47 a.m., RT drove to the Pharmacy and parked in the rear of the parking lot. At 8:51 a.m., RT made a phone call to defendant. At 8:53 a.m., defendant carried a bag out of the Pharmacy, walked over to RT's vehicle and exchanged something with RT. Defendant returned to the Pharmacy carrying a different bag and RT left the parking lot.

On September 12, 2009, RT went to the Pharmacy and parked in the lot at 8:38 a.m. RT went into the Pharmacy, remained for a few minutes before returning to his vehicle. RT then drove to a parking lot of an adjacent shopping center, where he parked and waited. At 8:55 am., defendant left the Pharmacy carrying paper towels and a brown paper bag. Defendant went to the rear of the Pharmacy parking lot and motioned to RT to come to him. RT drove his vehicle over to meet defendant and pulled alongside him. Defendant and RT exchanged bags through the passenger window; defendant walked back into the Pharmacy and RT drove away. Shortly after RT drove away from this meeting, law enforcement agents stopped RT's car and arrested him. As a result of a search of RT's car, law enforcement agents recovered five wholesale 100–tablet Oxycodone 80 mg bottles (the same type of bottle JS had described).

Following his arrest, RT provided a statement to law enforcement agents. RT stated that he purchased the wholesale bottles of Oxycodone, without a prescription and with cash payment, from a "Renaissance pharmacist named Bruce."[6] RT stated that he had been dealing with defendant in this manner for months. Between June and September 2009, RT indicated that he would purchase around four of those wholesale bottles, at a time, from defendant, once or twice a week. RT always paid defendant with cash and never gave defendant a prescription for the pills. RT paid defendant between $1,800 and $2,200 in cash for each wholesale bottle of Oxycodone.

On September 28, 2009, a federal search warrant was executed at the Pharmacy. Following the search, DEA conducted an audit into the sale of Oxycondone 80 mg tablets, including a review of the Pharmacy's inventory records and a hand count of all paper prescriptions for these pills. The audit revealed that 44,000 Oxycodone 80 mg pills, obtained by the Pharmacy during September 1, 2008 to September 26, 2009, were missing.[7]

**5.** Defendant, at the time a registered pharmacist, opened the Renaissance Family Pharmacy ("the Pharmacy") in Claymont, Delaware during February 2008. In January 2009, defendant transferred the Pharmacy to Jeremy Kashuba, a registered pharmacist.

**6.** Identified as defendant.

**7.** At a median price of $2,000 per wholesale bottle, the number of bottles missing from the Pharmacy had the potential to net the seller approximately $880,000.

According to DEA Special Agent Jeffrey Lauriha [8] ("Lauriha"), Oxycodone drug dealers often store the cash they receive in financial institutions or at their homes and businesses. Consequently, law enforcement agents subpoenaed bank records for the Pharmacy and two of defendant's known personal bank accounts. These records revealed that defendant was not depositing large amounts of cash into any of these accounts. For example, from January 1, 2009 through January 31, 2010, cash deposits into the accounts totaled $67,553. Additionally, law enforcement agents were unable to locate any safe deposit boxes for defendant in any area financial institution. Unable to find large sums of cash deposited or stored in defendant's bank accounts, law enforcement agents turned the investigation to defendant's residence and applied for a search warrant on April 22, 2010.[9]

On May 3, 2010, law enforcement agents searched defendant's residence and seized: (1) approximately $160,000 in cash; (2) a money-counting machine; (3) approximately 650 Oxycodone 30 mg pills in manufacture's bottles; (4) three handguns and (5) a notebook containing a list of assets. The notebook included a September 14, 2009 entry reflecting that $1,850,000 was held in various bank and investment accounts and another entry identifying over a million dollars stored in safes located at defendant's parent's residence.[10]

## III. STANDARD OF REVIEW

 The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. The threshold requirement for issuance of a warrant is probable cause. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317. In reviewing a search warrant application, and considering all of the circumstances described in the affidavit, there must be sufficient evidence presented that demonstrates that there is a "fair probability" that evidence of a crime will be located before validating a warrant. *Id.* at 238, 103 S.Ct. 2317; *United States v. Ritter,* 416 F.3d 256, 262–63 (3d Cir.2005). Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317.

 When a warrant is issued and later challenged, "a deferential standard of review is applied in determining whether the magistrate [judge's] probable cause decision was erroneous." *United States v. Ninety–Two Thousand Four Hundred Twenty–Two Dollars and Fifty–Seven*

---

**8.** Lauriha has been a DEA Special Agent for over 20 years with a focus, for the past three years, on the criminal diversion of prescription medication. Lauriha was the affiant of the search warrant affidavit at issue.

**9.** Based on his training and experience, Lauriha averred that defendant's residence was a location where he would likely keep cash (including records related to the location of the cash proceeds) as well as other business records (including contact information, transactions and inventory records) pertaining to drug dealing.

**10.** A search warrant was subsequently executed at the residence of defendant's parents. Agents recovered over $1.2 million in cash from a safe located in a basement closet.

*Cents,* 307 F.3d 137, 146 (3d Cir.2002); *United States v. Hodge,* 246 F.3d 301, 305 (3d Cir.2001); *Ritter,* 416 F.3d at 264. The decision of the issuing officer should be afforded great deference. *United States v. Zimmerman,* 277 F.3d 426, 432 (3d Cir.2002); *United States v. Conley,* 4 F.3d 1200, 1205 (3d Cir.1993). However, the reviewing court should not "simply rubber stamp a magistrate [judge's] conclusion." *United States v. Mortimer,* No. 03–4174, 387 Fed.Appx. 138, 140, 2005 WL 318650 at *1 (3d Cir. Feb. 10, 2005) (quoting *United States v. Tehfe,* 722 F.2d 1114, 1117 (3d Cir.1983)).

■ The role of the reviewing court, therefore, is to determine whether the magistrate judge had a substantial basis for determining that probable cause existed and not to decide probable cause de novo. *United States v. Stearn,* 597 F.3d 540, 554 (3d Cir.2010). "If a substantial basis exists to support the magistrate [judge's] probable cause finding, we must uphold that finding even if a 'different magistrate judge might have found the affidavit insufficient to support a warrant.'" *Id.* (citation omitted). In so doing, the court must confine itself to the affidavit and cannot consider other portions of the record. *Hodge,* 246 F.3d at 305. When resolving questionable cases, the deference given warrants should prevail. *Gates,* 462 U.S. at 237 n. 10, 103 S.Ct. 2317; *United States v. Jones,* 994 F.2d 1051, 1055 (3d Cir.1993).

## IV. DISCUSSION

### A. Stale Information

■ Defendant avers that the information in the affidavit is stale because it was seven months old at the time of its presentation to the magistrate judge. (D.I. 19, 28) Further, the affidavit is silent as to any contact by defendant with the Pharmacy after September 12, 2009, and there is no indication that defendant was involved in any distribution of illegal drugs after that date.

■ Generally, when information supporting a warrant application is too old, the information is stale and cannot establish probable cause. *United States v. Harvey,* 2 F.3d 1318, 1322 (3d Cir.1993). However, age alone does not determine whether information is stale. *United States v. Zimmerman,* 277 F.3d at 434; *United States v. Vosburgh,* 602 F.3d 512, 529 (3d Cir.2010); *United States v. Tehfe,* 722 F.2d 1114, 1119 (3d Cir.1983). Instead, the reviewing court must examine, on a case-by-case basis, the: (1) nature of the crime; and (2) the type of evidence sought by the warrant. *Zimmerman,* 277 F.3d at 426; *United States v. Towne,* 705 F.Supp.2d 125, 132 (D.Mass.2010) ("The likelihood that evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock.") (citations omitted). Moreover, "where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance." *United States v. Urban,* 404 F.3d 754, 774 (3d Cir.2005).

Considering this authority in light of the record at bar, the court finds that the information in the affidavit is not stale. With respect to the "nature of the crime," the factual allegations in the affidavit, along with the normal inferences that can be drawn from those allegations, demonstrate that defendant was engaged, over several months in 2009, in a significant illegal drug distribution operation involving over 40,000 pills and approximately $900,000. Accordingly, defendant's continuous course of conduct in a large scale drug operation made it reasonable to conclude that the illegal drug sales would continue beyond September 2009.

Further, the court finds that a person engaged in a large scale illegal drug distribution operation would maintain the type of evidence sought by the warrant [11] for an extended period of time. *See United States v. Rojas Alvarez,* 451 F.3d 320, 332 (5th Cir.2006). With respect to the cash sought, despite months of investigation, there were no significant cash deposits into defendant's known bank accounts. Therefore, it was reasonable for law enforcement agents, based on extensive training and experience, to infer that defendant kept the cash and/or records related to the illegal drug dealing at his residence. Accordingly, the court finds the magistrate judge had a substantial basis to conclude that it was probable that certain types of evidence related to defendant's alleged drug dealing would be stored at his residence.

## B. Nexus Between Alleged Illegal Drug Dealing and Search of Residence

■■■ Defendant contends that the affidavit does not set forth a sufficient nexus between his alleged drug dealing and his residence to support the issuance of the warrant. (D.I. 19, 28) Rather, he asserts the Pharmacy should have been searched as it had the strongest nexus to the alleged drug dealing. Defendant also challenges Lauriha's averments as largely boiler plate and of the type "found in every drug related search warrant application in Federal Court." (D.I. 28 at 4)

The United States Court of Appeals for the Third Circuit recently reiterated the analysis to apply to determine whether a sufficient nexus exists to justify a search of a home.

> The starting point is that a magistrate judge may infer probable cause from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide ... [evidence]. Proceeding from that premise, *Hodge,*[12] *Whitner,*[13] and *Burton*[14] permit the magistrate to infer from 'the type of crime,' 'nature of the items sought' and the defendant's 'opportuni[ties] for concealment' that a drug dealer in some circumstances may use his home to store evidence associated with drug dealing.... [T]he factual circumstances of [*Hodge, Whitner* and *Burton*] do not limit the inferences a detached magistrate is permitted to draw. We understand the District Court's inclination to read these cases narrowly, but we must reject its attempt to substitute bright-line rules for a more 'fluid... assessment of probabilities in particular factual contexts.' *Gates*[15] di-

11. The warrant authorized the agents to search for: (1) business-type records associated with defendant's drug dealing, including financial statements, logs, receipts, real estate records, checks, invoices, journals and address books; and (2) cash.

12. *United States v. Hodge,* 246 F.3d at 306 ("[N]o direct evidence that drugs or drug paraphernalia would be located at Hodge's home. However, there was significant evidence (of record) from which the magistrate judge might reach that conclusion").

13. *United States v. Whitner,* 219 F.3d 289, 298 (3d Cir.2000) ("Evidence associated with drug dealing needs to be stored somewhere,

and ... a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity ...").

14. *United States v. Burton,* 288 F.3d 91, 103 (3d Cir.2002) ("Direct evidence linking the residence [to be searched] to a criminal activity is not required to establish probable cause" for a search warrant; an accumulation of circumstantial evidence can be sufficient.)

15. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

rects, and we agree, that probable cause is an inquiry 'not readily, or even usefully, reduced to a neat set of legal rules.' *United States v. Stearn*, 597 F.3d at 559 (citations omitted).

Considering this authority against a record that includes a continuous course of illegal distribution of Oxycodone involving a large amount of cash and pills and the conclusions of where evidence would be likely kept, based on the significant experience of a DEA agent, the court finds that the magistrate judge had a substantial basis to conclude that evidence related to defendant's drug crimes would be stored at his residence.

## C. Good Faith Exception to the Exclusionary Rule

■ Alternatively, even if the court concluded that there was not a substantial basis for finding probable cause, that fact alone is insufficient to mandate the "extreme sanction of exclusion." *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The good faith exception to the exclusionary rule "instructs that suppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority' even though no probable cause to search exists." *Zimmerman*, 277 F.3d at 436 (quoting *Hodge*, 246 F.3d at 307). The Supreme Court's "evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral" judge compels the decision that such evidence should be admissible. *Leon*, 468 U.S. at 913, 104 S.Ct. 3405. The Supreme Court has held that a "warrant issued by a [judge] normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* at 922, 104 S.Ct. 3405.

The Third Circuit has identified four situations where an "officer's reliance on a warrant would not be reasonable and would not trigger" the good faith exception:

(1) Where the [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) Where the [judge] abandoned his or her judicial role and failed to perform his or her neutral and detached function; (3) Where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) Where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Zimmerman*, 277 F.3d at 436–37.

Considering the affidavit against *Leon* and its progeny, it was objectively reasonable for the officers to rely on the issuing magistrate judge's determination that probable cause existed.

## V. CONCLUSION

For the reasons stated, defendant's motion to suppress is denied. An appropriate order shall issue.

## ORDER

At Wilmington this 7th day of September, 2010, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion to suppress (D.I. 19) is denied.

2. A telephone status conference is scheduled for **Tuesday, September 28, 2010 at 8:30 a.m.,** with the government coordinating and initiating said call.

3. The time between this order and the teleconference shall be excluded under the Speedy Trial Act, 18 U.S.C. § 3161, et seq.