**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1265
_____

UNITED STATES OF AMERICA

v.

LOUIS ANTONIO ZAYAS,
                            Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 3-16-cr-00222-001)
District Judge: Honorable Malachy E. Mannion
_____

Argued September 22, 2021

Before:   SMITH, *Chief Judge*,[*] McKEE, and RESTREPO,
*Circuit Judges.*

(Filed: April 21, 2022)
_____

Joseph A. O'Brien, Esq.  [ARGUED]
Oliver Price & Rhodes
1212 South Abington Road
P.O. Box 240
Clarks Summit, PA 18411
        *Counsel for Appellant*

---

[*] Judge Smith was Chief Judge when this appeal was argued.
Judge Smith completed his term as Chief Judge and assumed
senior status on December 4, 2021.

Michelle L. Olshefski, Esq  [ARGUED]
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*.

During the early morning hours on July 7, 2016, Kathryn Ann Price was found dead in her bedroom from an overdose of fentanyl. The investigation that followed led to the arrest and prosecution of Louis Zayas. A jury subsequently convicted Zayas of distributing and conspiring to distribute the fentanyl that killed Price. He was also convicted of distributing fentanyl to someone who was pregnant as well as distributing it within 1,000 feet of a playground. The District Court sentenced Zayas to life imprisonment.

Zayas appeals arguing that the evidence was insufficient to establish guilt beyond a reasonable doubt, that he was prejudiced by the government's failure to timely disclose potentially exculpatory evidence, and that the Court erred by imposing two terms of life imprisonment. For the reasons below, we agree that the evidence is insufficient to support his conviction for distributing fentanyl within 1,000 feet of a playground as defined by the statute. However, we reject his other arguments and will therefore affirm in part, vacate in part, and remand for possible resentencing.

I.  **BACKGROUND**

Around midnight on July 7, 2016, a family member found Kathryn Ann Price dead in her bed. She was eight months pregnant. Investigators who responded to the emergency call observed evidence in Price's bedroom consistent with an apparent drug overdose. This included drug paraphernalia such as a spoon, syringes, and many white and

blue glassine baggies. Testing of the residue in a blue baggie established that it contained fentanyl, the same substance that an autopsy would subsequently confirm as the cause of her death.

Text messages between Price and Louis Zayas shortly before her death and video from surveillance cameras outside of Price's house soon caused investigators to focus on Zayas. The text messages, which are discussed in detail *infra* Section II.A.1., revealed that Zayas had delivered drugs to Price the same evening that she died and that she had ingested those drugs just before her death. Additionally, a security camera captured Price engaging in transactions with the occupant of a car later confirmed to be owned by Zayas. The video also confirmed that after Price obtained drugs from Zayas, she returned to her house and subsequently left only once to walk her dog.

Based on this evidence, investigators arrested Zayas at his home about a month after Price's death. During a Mirandized interview immediately following his arrest, Zayas admitted to selling what he believed to be heroin to Price on the day she overdosed. Thereafter, Zayas entered into a plea agreement, which he subsequently withdrew. After he withdrew from the plea agreement, a federal grand jury returned a four-count superseding indictment charging him with (1) conspiracy to distribute and possess with the intent to distribute a controlled substance in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C);[1] (2) distribution and possession with the intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2;[2] (3) distribution and possession with the intent to distribute a controlled substance within 1,000 feet of a daycare center with an attached outdoor playground in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), 860, and 18 U.S.C. § 2;[3] and (4) distribution and possession with the intent to distribute a

---

[1] (Count 1).
[2] (Count 2).
[3] (Count 3).

controlled substance to a pregnant individual in violation of 21 U.S.C. §§ 861(f), 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2.[4]

Following the close of all the evidence at the ensuing jury trial, Zayas moved for judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure. Zayas claimed that the evidence was insufficient to prove that he delivered fentanyl to Price and that the nearby playground was not open to the public as required for a conviction on Count 3.[5] He also argued that the government had to prove that he knew that Price was pregnant when he sold her drugs and that the evidence was insufficient to establish that element of Count 4.[6] Finally, Zayas moved to dismiss the superseding indictment based on the government's delayed disclosure of a potentially exculpatory statement he made during a proffer interview held pursuant to his initial plea discussions with the government.

The District Court denied both motions and Zayas was convicted on all counts. The District Court subsequently sentenced Zayas to a term of life imprisonment as mandated by 21 U.S.C. § 841(b)(1)(C). The sentence consisted of separate terms of life imprisonment for Counts 1 and 2 and one year of imprisonment on Counts 3 and 4, all to run concurrently. This timely appeal followed.[7]

## II.   DISCUSSION
### A.     Sufficiency of Evidence

"We exercise plenary review over a district court's grant or denial of a motion for judgment of acquittal based on

---

[4] (Count 4).

[5] *See* 21 U.S.C. § 860(e) (defining a playground for purposes of § 860(a) as "any outdoor facility . . . intended for recreation, *open to the public*, and with . . . three or more separate apparatus intended for the recreation of children" (emphasis added)).

[6] *See* 21 U.S.C. § 861(f) (making it unlawful to knowingly or intentionally distribute any controlled substance to a pregnant individual).

[7] We have appellate jurisdiction to review the final decision of the District Court pursuant to 28 U.S.C. § 1291.

the sufficiency of the evidence."[8] We interpret the evidence in the light most favorable to the government as the verdict winner and "do not weigh evidence or determine the credibility of witnesses in making [our] determination."[9] We will sustain a verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[10]

### 1. Distribution of Fentanyl Resulting in Death

Zayas was convicted on Count 2 of the superseding indictment for distributing the fentanyl that killed Price.[11] "Zayas does not deny selling Price drugs."[12] Nor does Zayas argue the government needs to prove that he knew he was selling Price fentanyl.[13] Rather, he argues that the evidence is insufficient to prove that the substance he sold her was the fentanyl that caused her death. He claims that the evidence shows only that he sold her heroin. More specifically, Zayas believes that: (1) the record contains no evidence that the drugs he delivered to Price contained fentanyl, (2) there is no evidence connecting him to the blue baggie containing fentanyl found in Price's bedroom, and (3) that it is at least, if not more likely, that Price obtained the fatal drugs from someone else. We disagree.

---

[8] *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009).

[9] *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003) (quotation marks omitted).

[10] *United States v. Bansal*, 663 F.3d 634, 665 (3d Cir. 2011) (quotation marks omitted).

[11] *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2; *Burrage v. United States*, 571 U.S. 204, 210, 134 S. Ct. 881, 187 L. Ed. 2d 715 (2014) ("Because the 'death results' enhancement increased the minimum and maximum sentences . . . it is an element that must be submitted to the jury and found beyond a reasonable doubt.").

[12] Appellant Br. at 11.

[13] *See United States v. Barbosa*, 271 F.3d 438, 458–59 (3d Cir. 2001) (holding § 841 does not require "the Government [to] prove more than the defendant's knowledge that he was trafficking in a controlled substance").

Our standard of review of a challenge to the sufficiency of the evidence is highly deferential.[14] As we noted at the outset, the government's evidence included text messages between Zayas and Price during the thirty-four-hour period before her death, video footage outside the Price home, and witness testimony, including admissions Zayas made after his arrest. The text messages themselves are evidence of the delivery of controlled substances, negotiating the prices and quantity of drugs, as well as locations of meetings. The relevant texts begin the day before Price's overdose.

**July 5, 2016 text messages:**

2:06 p.m. Zayas: Hey I made a new contact with damn good shit
2:45 p.m. Price: Like how good
2:59 p.m. Zayas: Not like the best I've ever had but good enough to get way higher than intended lol
3:00 p.m. Zayas: I actually get if from the middle man Scotts friend justin
3:02 p.m. Price: How much
. . .
3:09 p.m. Price: Ima try to get sum cash how much 40?
. . .
4:41 p.m. Zayas: Yeah 40 but I'd rather give him 60 than give these guys another 30 lol[15]

**July 6, 2016 text messages:**

1:13 p.m. Zayas: I'm just getting up I'm a Lil sick so u have anything
1:20 p.m. Price: Na not rite now… Can u pawn Reg tools?
2:06 p.m. Zayas: Not really none of the places really want them
2:09 p.m. Price: I'm working on get cash now u can get?
. . .

---

[14] *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001).
[15] SApp. at 010–013 (Exs. 3.4–3.7); App. at 540–42.

2:32 p.m. Price: I'm getting 50$ in a Lil bit
2:33 p.m. Price: U can get
2:34 p.m. Zayas: Yeah n his stuff is goid
2:34 p.m. Zayas: Good
2:36 p.m. Price: Kk I asked the kid to drop it off b4 3 …..u got a sub tho to I can get like a half?
2:39 p.m. Price: Call now set it uo
3:03 p.m. Zayas: He's just getting off Hazelton exit now he's gonna call me back in a minute

. . .

3:04 p.m. Price: So u wanna meet him here
3:04 p.m. Price: He's got it on him
3:16 p.m. Price: ?
3:36 p.m. Price: Ask him how long.. My sister will be home soon[16]

At Price's request, and consistent with her 2:36 p.m. message, her friend Anthony Almeida placed $50 in the mailbox outside her home between 2:00 p.m. and 3:00 p.m. Video footage shows Zayas's car parking near Price's house at 3:55 p.m. on July 6. Zayas was the driver, and an individual identified as Justin Haines was in the passenger seat. Price can be seen approaching the car on the passenger side and engaging in a hand-to-hand transaction as she leans into the car.[17] During the interview after his arrest, Zayas told the DEA that he and Haines obtained money from Price to sell her drugs.[18] The video also shows Zayas and Haines driving away after Price went to his car. Zayas and Haines then proceeded to another location in Hazleton, Pennsylvania to get drugs to sell to Price. About an hour later, the text messaging between Price and Zayas resumed:

---

[16] SApp. at 015–020 (Exs. 3.9–3.14); App. at 543–47.

[17] Zayas admitted that he obtained the suspected heroin with Haines' assistance and that Haines was with him in the car both times they went to Price's house.

[18] Zayas and Price agreed to "1 n a half 4 50" meaning one and half bundles (fifteen bags) of drugs for $50. SApp. at 019 (Ex. 3.13); App. at 626. The two agreed that Price would get ten bags, and five would go to Zayas as a tip for the effort. App. at 627.

4:55 p.m. Zayas:  Call u in 1 min
5:06 p.m. Price:  Pull into the parking lot
5:07 p.m. Price:  Give me a min my sister is leaving[19]

Zayas returned to Price's house at 5:07 p.m., between five and seven hours before Price's death. Again, Price walked to the passenger side of the car where she obtained a bundle, or ten bags of drugs, via another hand-to-hand exchange before returning to her house. Afterward, the two continued to exchange text messages:

5:30 p.m. Price:  Please don't forget about the sub I need it for the morning ….Friday I get paid to so Ima give u either cash or tic for it whichever u prefer
5:31 p.m. Price:  There good tho… Thank god u only did 2[20]

Zayas stated in his post-arrest interview that after delivering the drugs to Price he too used some of the same drugs and immediately passed out. When asked if it was common for him to pass out after using heroin "[h]e emphatically stated no, he's never passed out a day in his life."[21] Zayas's statement is significant because it suggests that the drugs he and Price used that day were unusually potent. Increased potency is consistent with the presence of fentanyl, rather than the drugs being solely heroin.[22]

As noted, video footage established that Price left her house only to walk her dog after purchasing drugs from Zayas. At about 9:30 p.m., Price told her mother she was going to bed and went to her bedroom. Around 10:00 p.m., Price's sister

---

[19] SApp. at 021 (Ex. 3.15); App. at 547.

[20] SApp. at 021–022 (Exs. 3.15–3.16); App at 548. A "tic" is short for ticket, which is slang terminology for a bag of heroin or drugs. App. at 649.

[21] App. at 633.

[22] *See United States v. Walker*, 922 F.3d 239, 244 n.2 (4th Cir. 2019), *cert. granted and judgment vacated on other grounds*, *Walker v. United States*, --- U.S.----, 140 S. Ct. 474, 205 L. Ed. 2d 266 (2019) (noting that "[f]entanyl is sometimes added to heroin to increase its potency, which also increases the risk of an overdose death" (quotation marks omitted)).

tried to call Price, however Price did not respond. Around midnight on July 7, Price's sister arrived home, entered Price's bedroom and found Price unresponsive and face down in her bed. Emergency personnel were summoned and responding paramedics found Price had no signs of life and concluded she was dead.

A forensic pathologist conducted an autopsy on Price the next day. The findings included a fresh needle mark on Price's right hand that was believed to have occurred at the time of her death. The toxicology report revealed the level of fentanyl in Price's blood was twenty-four nanograms per mil and a metabolite of fentanyl at twelve nanograms per mil. The testifying pathologist concluded, with 100 percent confidence, that the cause of Price's death was the injection of fentanyl. Additionally, a forensic toxicologist concluded that heroin did not play a part in Price's death.

It is uncontroverted that Zayas delivered a controlled substance to Price in the hours just before her death. The evidence includes Zayas's admission that he sold Price drugs about seven hours before she was found dead. During their "drug talk," she asked him to buy her $30 worth of drugs and he agreed. Zayas, along with Haines, picked up the money from Price at her house, and after getting the drugs, returned, and delivered one bundle (ten bags) of drugs to Price. These facts were not disputed at trial, nor are they at issue on appeal. Furthermore, they are corroborated by Price's text messages and video footage from security cameras at Price's house.

Since Price was trying to get drugs before she met Zayas and only left home to walk the dog after Zayas sold her drugs, the jury could readily conclude that those drugs were the only drugs she had that night. The evidence is sufficient to demonstrate that she had neither money nor opportunity to obtain drugs from anyone else.[23] On the day of her death, Price even told Zayas that she did not have any drugs. When Zayas told Price that he was a "[l]il sick" and asked if she had

---

[23] *See United States v. Sumlin*, 956 F.3d 879, 891–93 (6th Cir. 2020) (finding sufficient evidence to support a conviction under § 841(a)(1) based on circumstances including the temporal proximity of a drug-related text message exchange).

anything, Price responded, "Na not rite now."[24] Moreover, the evidence indicates that Price did not have money to purchase drugs other than the drugs she obtained from Zayas. She texted Zayas, "Ima try to get sum cash how much $40?"[25] and "Can u pawn Reg tools? . . . I'm working on get cash now . . . I'm getting 50$ in a Lil bit . . . I asked the kid to drop it off b4 3."[26] Finally, Price reminded Zayas to get her a "sub," short for suboxone,[27] and she would pay him on Friday when she would get paid.[28] A DEA agent also testified that in his experience, habitual drug users, like Price, do not store drugs for later use.

A reasonable trier of fact could also conclude Price injected the drugs she purchased from Zayas shortly after receiving them and that those drugs contained a fatal dose of fentanyl. Soon after Zayas delivered the drugs to Price she texted him: "There good tho… Thank god u only did 2."[29] This text suggests not only that she used the drugs Zayas gave her a few minutes before, but also alludes to the drug's potency. As we noted earlier, Zayas also discussed the potency of the drugs he was getting from his source on the day before he delivered drugs to Price. He described them as "damn good shit" and "good enough to get way higher than intended."[30] Zayas also told the DEA that when he took the drugs, after delivering some to Price, he passed out. He said he never passes out after taking heroin. This clearly allows a rational trier of fact to conclude beyond a reasonable doubt that Zayas delivered drugs containing a fatal dose of fentanyl to Price, and she died because she ingested them.[31] Although Zayas may not have

---

[24] SApp. at 015 (Ex. 3.9); App. at 543; *see also United States v. Ross*, 990 F.3d 636, 639 (8th Cir. 2021) (concluding that a drug user's urgent desire to ingest drugs undermines a claim that they already had drugs in their possession).

[25] SApp. at 012 (Ex. 3.6); App. at 542.

[26] SApp. at 015–018 (Exs. 3.9–3.12); App. at 543–45.

[27] Suboxone is a medication designed to reduce opioid withdrawal symptoms along with the desire to use opioids. *United States v. Brizuela*, 962 F.3d 784, 787 (4th Cir. 2020).

[28] SApp. at 021–022 (Exs. 3.15–3.16); App at 548.

[29] SApp. at 022 (Ex. 3.16); App. at 548.

[30] SApp. at 010–011 (Exs. 3.4–3.5); App. at 540–41.

[31] *See United States v. Davis*, 970 F.3d 650, 658 (6th Cir. 2020) (holding it is rational for a jury to infer that the drug at

known that the drugs he delivered to Price contained fentanyl, his subjective belief is simply irrelevant.[32]

Zayas's argument that the evidence is insufficient because the record instead suggests a connection between the blue glassine bag, found near Price's body, and a drug dealer other than himself is also unavailing. He contends the evidence could be interpreted to suggest that "drugs delivered by [another drug dealer] caused Price's death."[33] Zayas argues this drug dealer, only identified as "Dee," was more likely to have supplied the fentanyl to Price than he was. This assertion is mostly based on the fentanyl residue found in a blue glassine baggie near Price's body. Although around 100 blue and white glassine baggies were found in Price's bedroom, only a single blue bag contained any residue and it was the only one submitted to the laboratory. Testing confirmed it was fentanyl residue.

Text messages between Price and Dee five days before her death show that Price asked Dee, "U have the blue one's," referring to blue glassine baggies.[34] Zayas told the DEA immediately following his arrest that he believed the baggies he delivered to Price on the day of her death were white, but he was not sure. Zayas seizes upon that statement to argue that there is no evidence connecting him to the blue baggie found in Price's home. He also relies on the prior text exchange between Price and Dee to claim that Price got the blue baggie from Dee and not from him. But this argument misses the point.[35]

---

issue was fentanyl, rather than heroin, based on its high potency).

[32] *See Barbosa*, 271 F.3d at 458–59 (holding that the government need not prove the defendant's knowledge that he was trafficking in the precise controlled substance at issue to sustain a conviction under § 841(a)).

[33] Appellant Br. at 20.

[34] SApp. at 032 (Ex. 4.9); App. at 664.

[35] *See United States v. Caraballo-Rodriguez*, 726 F.3d 418, 432 (3d Cir. 2013) ("It is up to the jury—not the district court judge or our Court—to examine the evidence and draw inferences.").

Text messages between Price and Dee do not negate the evidence against Zayas nor diminish its sufficiency.[36] "Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the scope of our inquiry for review of sufficiency of the evidence challenges."[37] Instead, only when the record contains no evidence, however it is weighed, from which the jury could find guilt beyond a reasonable doubt, will we overturn a verdict.[38]

As we have explained, the jury could reasonably conclude that Price did not have any drugs before she purchased the drugs from Zayas just before her death. The jury could also reasonably conclude that those drugs contained fentanyl because both Price and Zayas had discussed the drugs' unusual potency. There was clearly something different about the drugs that Price obtained from Zayas the night she overdosed, and it is mere speculation to argue that she had drugs from someone other than Zayas. In fact, the evidence is to the contrary. Price's own text messages support that she did not have any drugs the night of her death before she obtained drugs from Zayas. The evidence is clearly sufficient to establish Zayas's guilt beyond a reasonable doubt.[39]

### 2. Conspiracy to Distribute Fentanyl Resulting in Death

The jury also convicted Zayas of conspiring to distribute (or distributing) a controlled substance resulting in death as charged in Count 1. To establish a conspiracy, the government must prove a shared unity of purpose, an intent to achieve a common goal, and an agreement to work together

---

[36] *See United States v. Garner*, 915 F.3d 167, 169 (3d Cir. 2019) ("[W]e do not draw inferences in the defendant's favor when reviewing for sufficiency of the evidence . . . .").

[37] *Caraballo-Rodriguez*, 726 F.3d at 432.

[38] *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989).

[39] *See United States v. Miller*, 527 F.3d 54, 60 (2008) ("[W]e must uphold a jury's verdict 'if there is substantial evidence from which a rational trier of fact could find guilt beyond a reasonable doubt.'" (quoting *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993))).

toward that goal.[40] The government produced enough evidence to prove that Zayas distributed fentanyl to Price as the result of a preconceived scheme or common understanding with Haines.[41]

According to Zayas, three people could be considered co-conspirators: Dee, Price, or Haines. He argues however, that the evidence fails to establish the required elements of conspiracy between himself and any of those three individuals. Although we agree that a rational trier of fact could not find a conspiratorial agreement between Zayas and Dee or Price, Zayas is incorrect about Haines.[42] Zayas argues that "[w]hile [he] indicated that he intended to compensate Justin [Haines], the record does not show that Justin expected compensation or that he had any knowledge that in being in Zayas's presence he was participating in an illegal conspiracy."[43] This is only half true.

Zayas and Haines were in the car together and picked up the money from Price. They also both returned and delivered the drugs to her. The text messages between Zayas and Price reveal that they intended to tip Haines for acting as the middleman in the transaction. He was part of a conspiratorial agreement with Zayas to obtain drugs for Price and then distribute drugs to her.

---

[40] *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002).
[41] *See United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016).
[42] In response to Zayas's Rule 29 motion for acquittal of the conspiracy count, along with finding that the jury could convict Zayas for conspiracy with Haines, the District Court incorrectly concluded Zayas could also be found to have conspired with Price. However, "[i]t is well-settled that a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sale agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). The government never argued Price was a co-conspirator with Zayas.
[43] Appellant Br. at 23.

Yet the most substantial evidence of an agreement between Zayas and Haines was Zayas's description of going with Haines to get the drugs after picking up the money from Price. Zayas explained that he drove Haines to a street corner, dropped him off, and waited for Haines to contact him by cell phone. When Haines contacted Zayas a couple of minutes later, Zayas picked up Haines and the two returned to Price's house to deliver the drugs. The jury could hardly conclude anything other than that Zayas and Haines conspired together to distribute the controlled substance to Price.

### 3. Distribution of Fentanyl to a Pregnant Individual

Zayas moved for judgment of acquittal on Count 4 (distribution to someone who is pregnant) at the close of the evidence. 21 U.S.C. § 861(f), captioned "Distribution of controlled substance to pregnant individual," states in its entirety: "Except as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally provide or distribute any controlled substance to a pregnant individual in violation of any provision of this subchapter." Aside from contending that the evidence was insufficient to establish he delivered fentanyl, Zayas claimed that the record was also insufficient to establish that he knew Price was pregnant. Along with arguing that the evidence was sufficient, the government argued that it was unnecessary to prove knowledge of the pregnancy to sustain a conviction under the statute. Rather, the government claimed that § 861(f) is a crime of strict liability.

The District Court agreed that knowledge of Price's pregnancy was not required to sustain a conviction under § 861(f) and instructed the jury accordingly:

> Count 4 of the superseding indictment charges the defendant with distribution of a controlled substance to a pregnant individual, namely Kathryn Price. This is a separate violation of federal law. In order to find the defendant guilty of this offense, in addition to those elements that I've already explained to you, you must also find that the government prove beyond a reasonable doubt that the defendant distributed a controlled substance to a pregnant individual, namely

14

Kathryn Price. *The government need not prove that when the defendant distributed the controlled substance he knew that the individual was pregnant*.[44]

The jury convicted Zayas for distribution of a controlled substance to a pregnant individual (Price) as charged in Count 4.

As noted, under the statute, it is "unlawful for any person to *knowingly or intentionally* provide or distribute any controlled substance to a pregnant individual."[45] The Supreme Court has explained that "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element."[46] The Court explained that this is so because "[i]n ordinary English, where a transitive verb has an object, listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence."[47]

This presumption, that the *mens rea* requirement generally extends to each element of a criminal statute, may be rebutted in special contexts.[48] The government urges us to agree with other circuit courts of appeals in deciding the appropriate *mens rea* in a comparable provision of § 861. It points us to § 861(a)(1), which makes it unlawful "to knowingly and intentionally . . . employ, hire, . . . or coerce a person under eighteen years of age to violate any provision of this subchapter or subchapter II."[49] Five circuit courts of appeals have held that the government need not prove the defendant knew the juvenile's age to establish guilt under that subsection.[50] These courts reason that the legislative intent of

---

[44] App. at 736–37 (emphasis added).

[45] 21 U.S.C. § 861(f) (emphasis added).

[46] *Flores-Figueroa v. United States*, 556 U.S. 646, 652, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009).

[47] *Id.* at 650.

[48] 947 F.3d 139, 143 (3d Cir. 2020).

[49] 21 U.S.C. § 861(a)(1).

[50] *See United States v. Frazier*, 213 F.3d 409, 419 (7th Cir. 2000); *United States v. Cook*, 76 F.3d 596, 602 (4th Cir.

protecting juveniles would be subverted if a defendant could close his or her eyes to the age of minors.[51] Thus, argues the government here, we should similarly consider the need to protect unborn children in deciding the required *mens rea* in § 861(f).

Concomitantly, the government urges us to approach § 861(f) as we approached § 860(a) in *United States v. Jackson*.[52] As will be discussed below, § 860(a) makes the possession with the intent to distribute a controlled substance within 1,000 feet of a school unlawful.[53] In *Jackson* we concluded that § 860(a) does not require the government to prove the defendant knew that s/he was within 1,000 feet of a school while possessing a controlled substance.[54] Instead, the government need only prove the defendant knowingly possessed the controlled substance within 1,000 feet of a school and intended to distribute it.[55] Thus, the government contends that knowledge of pregnancy is similarly not required under § 861(f).

The government's argument ignores the textual distinctions between sections 860(a) and 861(f). Section 860(a) does not contain any *mens rea* requirement. Rather, it simply states that "[a]ny person who violates section 841(a)(1) . . . by distributing . . . a controlled substance . . . within one thousand feet of . . . [a] school" is subject to twice the maximum penalty authorized by § 841(b).[56] The *mens rea* element of § 860(a) is found in the violation of § 841(a)(1), but that is distinct from

---

1996); *United States v. Chin*, 981 F.2d 1275, 1280 (D.C. Cir. 1992); *United States v. Valencia-Roldan*, 893 F.2d 1080, 1083 (9th Cir. 1990); *United States v. Carter*, 854 F.2d 1102, 1108–09 (8th Cir. 1988).

[51] *See, e.g.*, *Frazier*, 213 F.3d at 419 ("The intent of Congress in § 861(a) was to protect juveniles indicating an intent to place the burden on the drug dealer to know who is working for him.").

[52] 443 F.3d 293 (3d Cir. 2006).

[53] 21 U.S.C. § 860(a).

[54] *Jackson*, 443 F.3d at 299.

[55] *Id.*

[56] 21 U.S.C. § 860(a).

the substantive provisions of § 860(a) that criminalize distribution within 1,000 feet of a school.[57]

Unlike § 860(a), § 861(f) includes an express *mens rea* requirement. That requirement specifies that it is "unlawful for any person to knowingly or intentionally provide or distribute any controlled substance to a pregnant individual."[58] The text therefore limits criminal liability under § 861(f) to such sales being made "intentionally or knowingly . . . to a pregnant individual[.]"[59] The limitation is independent of, and in addition to, the other provisions of § 841(a)(1). Therefore, *Jackson* supports the conclusion that the government bears the burden of proving the defendant's knowledge of an individual's pregnancy.

Section 861(f) thus requires knowledge of the transferee's pregnancy. Even if the government's contrary interpretation suggests an ambiguity in the statute, we would then consult legislative history to resolve it.[60] The floor debate when § 861(f) was offered as an amendment to the Controlled Substances Act shows that the seller's knowledge of the pregnancy was intended to be a required element.[61] In addressing questions on whether the text of the amendment required proof of a defendant's knowledge of the pregnancy, Senator Hawkins, who offered the amendment, answered: "Yes, reasonable knowledge."[62]

Accordingly, the District Court here erred in removing the knowledge element from the jury's consideration by instructing jurors that such proof was unnecessary. This does not, however, mean that Zayas's conviction on Count 4 must be vacated. "[T]he omission of an element [from jury

---

[57] *Jackson,* 443 F.3d at 299.

[58] 21 U.S.C. § 861(f).

[59] *See id.*

[60] *United States v. Hodge*, 321 F.3d 429, 437 (3d Cir. 2003) ("When the language of a statute is ambiguous, we look to its legislative history to deduce its purpose.").

[61] *See* 99 CONG. REC. 26,696–98 (1986).

[62] *Id.* at 26,698 (statement of Sen. Hawkins).

instructions] is subject to harmless-error analysis."[63] "Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."[64] Therefore, rather than vacating the conviction, as Zayas urges, we must review for harmless error.

The harmless-error standard is the converse of the insufficient evidence standard. Rather than ask whether any rational jury could conclude that Zayas knew Price was pregnant, we must determine whether a rational juror viewing the evidence *could only* have concluded that he knew she was pregnant.[65]

Dr. Ross, who conducted the autopsy, along with Price's father and mother, all testified that Price was eight months pregnant. When asked "how big" Price was in her eighth month of pregnancy, her mother stated: "She was huge. You can definitely tell she was pregnant."[66] Similarly, when asked how far along Price was in her pregnancy, Price's sister stated, "She had that pregnant belly."[67] Finally, when Price's brother was asked if Price was noticeably pregnant, he responded, "[V]ery."[68] There was also evidence that Zayas and Price were together in a car only a week before her death in July. The jury thus could have readily assumed that her stomach would not have been covered by any kind of heavy clothing that would have prevented Zayas from seeing her "pregnant belly." We therefore conclude that the evidence supported only one conclusion: Zayas knew Price was

---

[63] *Neder v. United States*, 527 U.S. 1, 10, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

[64] *Id*. at 9 (emphasis in original omitted).

[65] *See United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011) ("[R]equir[ing] reversal unless it can be 'prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (third alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967))).

[66] App. at 206.

[67] App. at 248.

[68] App. at 278.

pregnant when he sold her the drugs that killed her. The Court's erroneous charge as to that element of § 861(f) was therefore harmless.

### 4. Distribution or Possession with the Intent to Distribute Fentanyl within 1,000 Feet of a Playground

Count 3 of the superseding indictment charged Zayas with distribution or possession with the intent to distribute a controlled substance within 1,000 feet of a playground in violation § 860(a). This section provides that

> [a]ny person who violates section 841(a)(1) . . . by distributing, possessing with intent to distribute . . . a controlled substance . . . within one thousand feet of, the real property comprising a . . . playground . . . is . . . subject to (1) twice the maximum punishment authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b).[69]

Section 860(e)(1) defines a playground as "any outdoor facility . . . intended for recreation, *open to the public*, and with any portion thereof containing three or more separate apparatus intended for the recreation of children."[70]

By convicting Zayas under § 860(a), the jury necessarily concluded that he distributed fentanyl within 1,000 feet of the playground attached to the Busy Bee day care facility. The day care is located across the street from Price's house, where the delivery took place. The Busy Bee's owner testified about the characteristics of the facility, including the attached playground. The facility itself is privately owned and comprises the entire bottom level of a building. Members of the general public may pay to enroll in the day care. Attached to the rear of the day care center is a fenced-in play area, containing several pieces of plastic equipment for enrolled children to use. The fence is secured by a latch.

Zayas moved for a Rule 29 acquittal on this Count arguing that the evidence was insufficient to establish that the

---

[69] 21 U.S.C. § 860(a).
[70] *Id.* § 860(e)(1) (emphasis added).

Busy Bee playground satisfied the statutory definition of playground under § 860(e)(1). Specifically, he asserted that the attached playground is not "open to the public."[71] The jury was instructed that a conviction for this offense could be sustained by finding beyond a reasonable doubt that Zayas knowingly and intentionally possessed with intent to distribute fentanyl "within 1,000 feet of the real property comprising a daycare center with an attached outdoor playground."[72] The jury, however, was not provided with the statutory definition of a playground. Only after the jury returned a guilty verdict did the District Court deny Zayas's motion for acquittal, finding, as a matter of law, the playground was open to the public within the meaning of § 860(e)(1).

We now join several other circuit courts of appeals in holding that the definition of a playground must be proven as an element of § 860(a).[73] In *United States v. McQuilkin,* we held that § 860 is a substantive offense separate from § 841(a)(1); it is not a sentencing enhancement.[74] We reasoned that "it requires a separate and distinct element—distribution

---

[71] App. at 696.

[72] App. at 734.

[73] *See United States v. Rojas Alvarez*, 451 F.3d 320, 328 (5th Cir. 2006) (holding "the congressional definition of playground must be proven as an element of a § 860(a) offense"); *United States v. Migi*, 329 F.3d 1085, 1087 (9th Cir. 2003) ("The Government must prove four elements to meet the definition of a 'playground.'"); *United States v. Horsley*, 56 F.3d 50, 51–52 (11th Cir. 1995) (affirming a conviction where the evidence was sufficient to establish that the elements of the definition of "playground" as established by Congress); *United States v. Clanton*, 32 F.3d 569 (6th Cir. 1994) (unpublished table decision) ("From these facts, a rational trier of fact could conclude . . . that the playgrounds in issue were open to the public . . . ."); *United States v. Parker*, 30 F.3d 542, 552–53 (4th Cir. 1994) (concluding, because Congress chose to define playground in a specific manner, proof must be adduced to each of the four-part definition in § 860(a) to sustain a jury's conviction).

[74] 78 F.3d 105, 108 (3d Cir. 1996).

within 1,000 feet of a school."[75] Thus, due process requires that a conviction under § 860(a) be supported by proof beyond reasonable doubt of all the elements of that offense.[76] These include the distribution, or possession with intent to distribute, a controlled substance "within 1000 feet of (1) an 'outdoor facility,' which is (2) 'intended for recreation,' (3) 'open to the public,' and also (4) contains 'three or more separate apparatus intended for the recreation of children.'"[77]

Here, the jury was asked to weigh the evidence of Zayas's intent to distribute a controlled substance within 1,000 feet of a playground without knowing the government had to prove that the area next to the Busy Bee constituted a playground under § 860(a). When examining the adequacy of a jury charge, "we determine whether the instruction, viewed as a whole in the light of the evidence, fairly and adequately submits the issues to the jury."[78] "[W]here terms are not readily understood by the jury or where the possibility of confusion concerning a term exists, the court should define or explain such term."[79] Unlike many other facilities enumerated in § 860(a), such as elementary schools or universities, Congress provided a specific definition for a playground.[80]

To sustain a conviction under § 860(a), the government must prove a playground meets the statutory definition in §

---

[75] *Id.* at 108–09.

[76] *See United States v. Harra*, 985 F.3d 196, 211 (3d Cir. 2021) ("Once the Government chooses to charge a particular offense, it undertakes the burden to 'convince the trier of all the essential elements of guilt.'" (quoting *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970))).

[77] *Rojas Alvarez*, 451 F.3d at 328 (quoting 21 U.S.C. § 860(e)(1)).

[78] *United States v. Castro*, 776 F.2d 1118, 1128 (3d Cir. 1985).

[79] *United States v. Whitehead*, 176 F.3d 1030, 1040 (8th Cir. 1999) (alternation in original) (quotation marks omitted).

[80] *See United States v. Smith*, 13 F.3d 380, 382 (10th Cir. 1993) (holding conclusory statements describing a park as a "playground" were insufficient to prove the within 1,000 feet of a playground element of § 860(a)).

860(e)(1). That requires that the facility be open to the public.[81] The ordinary term "playground" has varied meanings. "We refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words."[82] The Oxford English Dictionary defines a playground as "[a] piece of ground used for playing on, *esp*. one attached to a school or in a public park."[83] Merriam-Webster defines it as "a piece of land used for and usually equipped with facilities for recreation especially by children" or "an area known or suited for activity of a specified sort."[84] But because Congress limited the reach of the statute to playgrounds "open to the public," not all playgrounds, as defined above, are "playgrounds" as defined by Congress. Therefore, in Zayas's case, the jury had to find beyond a reasonable doubt that his distribution of fentanyl occurred near a playground as defined in the statute, rather than a "playground" in the ordinary sense of the term. The jury was never informed of that.

Whether a playground is open to the public is a mixed question of law and fact that is typically submitted to the jury.[85] Since whether the Busy Bee playground was open to the public was not properly submitted to this jury, Zayas's conviction under § 860(a) can only stand if the court's omission was harmless.[86] This is unlike the factual determination of whether Zayas knew that Price was pregnant when he sold her the fatal dose of drugs. Here, the failure to instruct the jury on the statutory definition of a playground and then asking the jury to

---

[81] *Rojas Alvarez*, 451 F.3d at 328.

[82] *United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) (citing *Appalachian States Low-Level Radioactive Waste Comm'n v. Pena*, 126 F.3d 193, 197–98 (3d Cir. 1997)).

[83] *Playground*, *Oxford English Online Dictionary*, https://www.oed.com/view/Entry/145499?redirectedFrom=playground#eid (last visited Mar. 6, 2022).

[84] *Playground, Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/playground (last visited Mar. 6, 2022).

[85] *See Horsley*, 56 F.3d at 52 (affirming the district court's submission of whether a playground was open to the public to the jury as a factual issue "since it could not be resolved without reference to the evidence in the record").

[86] *See Neder*, 527 U.S. at 10.

determine whether the Busy Bee playground satisfied the definition in § 860(a) was not harmless.

The government's contention that this playground was open to the public is solely based on the testimony of the Busy Bee's owner who reported that the day care facility itself is open to the general public on a fee basis. The government therefore argues that is sufficient for any jury to reasonably infer that the attached playground is similarly open to the public. We are unpersuaded.

The term "open to the public," as used in the statute, implicates the accessibility of the playground. In the statute's penalty section (a), the words "public" and "private" are often used to identify applicable types of facilities.[87] Examples include a "public or private college," a "public or private youth center," and "public swimming pool."[88] Therefore, "public" and "private" in the statute are adjectives that modify the proprietary nature of each facility. Playground, however, is distinctly conditioned in section (e) and must be "open to the public."[89] Public is thus used as a noun, modified by "open to." Therefore, the playground must be accessible to the general public rather than being publicly maintained or owned.

That the Busy Bee allows members of the general public to enroll in its day care facility and thereby gain access to the attached playground does not, without more, make the playground itself accessible to the general public. In fact, when asked at trial whether the playground "is . . . open to the general public for use," the owner responded that it was not.[90] The government's assertion that the Busy Bee playground is open to the public because anyone can gain access to it by enrolling in the day care center would negate the congressional restriction on the reach of the statute. It is hard to imagine a playground that would not be "public" under the government's broad reading. A member of the general public could gain access to even the most restrictive facilities by paying a fee and satisfying any other membership requirements. The most restrictive private club is, after all, accessible to any member

---

[87] 21 U.S.C. § 860(a).

[88] *Id.*

[89] *Id.* § 860(e).

[90] App. at 428.

of the public who joins the club and pays applicable fees. We therefore reject the government's invitation to stretch this statute to include the Busy Bee playground.

We also consider that the Busy Bee playground is surrounded by a fence secured with a latch. While the existence of a latched fence is not dispositive of whether a playground is or is not open to the public, it is certainly relevant to the inquiry. Without evidence that the secured fence serves some purpose other than keeping the public out and restricting access, we can only conclude that the fence serves to exclude the general public from the recreational area it encompasses.

Moreover, in interpreting whether the Busy Bee playground is accessible to the public, we are persuaded by the very helpful and thoughtful analysis of an analogous state statute by the Texas Court of Criminal Appeals in *Curlee v. State*.[91] There, in concluding that evidence was insufficient to support the "open to the public" element of the Texas drug-free zone statute, the court relied largely on the owner's apparent intention to control and limit access to the playground.[92] *Curlee* involved a church playground surrounded by a chain link fence with four gates.[93] Evidence showed that two of the gates were locked, one with a deadbolt, the other with a padlock, while the other two gates could have been locked in a similar manner.[94] The Court in *Curlee* concluded that the locked gates signified that the church intended to assert dominion and control over access to the playground. That those attempts were less than perfect, or even inadequate, to keep members of the general public out, did not transform the playground into one that was "open to the public."[95]

---

[91] 620 S.W.3d 767 (Tex. Crim. App. 2021). The Texas statute criminalizing possession within 1,000 feet of a playground, like § 860(a), requires that the playground be "open to the public." *See* Tex. Health & Safety Code Ann. § 481.134(a)(3)(B).

[92] *Curlee*, 620 S.W.3d at 780–81.

[93] *Id.* at 781.

[94] *Id.*

[95] *Id.*

The fencing surrounding the Busy Bee playground similarly suggests the owner sought to exert at least some level of control over access to the playground and preclude access by the general public, even though that exercise of dominion was far from perfected. The fence contained a single gate secured with a latch, and it is unclear from the record whether it could be, or was intended to be, locked. Nevertheless, the fact that it may not have been locked cannot be interpreted as an open invitation to members of the general public to "come on in" and use the Busy Bee's facilities for recreation. It is also fair to assume that a member of the general public would not conclude he or she was permitted to enter and use the playground just because the gate may not have been locked. Accordingly, we will vacate Zayas's conviction on Count 3 for selling a controlled substance within 1,000 feet of a playground as defined in § 860(e)(1), and we will remand for resentencing on that Count.

## B. Disclosure of *Brady* Material

Zayas also contends that the superseding indictment should have been dismissed because the government failed to disclose exculpatory evidence in a timely manner. To the extent that this evidence constitutes *Brady* material,[96] it was made available to Zayas in the afternoon on the second day of a four-day trial. Zayas was therefore able to effectively use the evidence at trial, and any delayed disclosure was successfully cured.

Zayas's challenge centers on the government's failure to timely disclose one of his statements that he believed the drugs that he delivered to Price were in white bags.[97] He told the DEA investigators this twice. The first time was while being interviewed immediately following his arrest when he stated he was not sure but thought maybe they were white. This statement was disclosed to Zayas before trial. The second time was during the proffer interview with the DEA after Zayas's initial agreement to plead guilty and was memorialized in an agent's notes. These notes, however, were not provided to Zayas until late on the second day of trial and are the basis of

---

[96] *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (holding that the suppression of material evidence by the prosecution violates due process).

[97] Appellant Br. at 12–13.

his *Brady* challenge. Zayas contends that the government's delayed disclosure of the DEA's notes resulted in prejudice because it greatly affected his trial strategy and interfered with his ability to examine some witnesses about the discrepancy. We disagree.

*Brady v. Maryland* held the government's suppression of evidence favorable to the defendant violates due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [government]."[98] Zayas and the government agree the statements described above are indeed *Brady* material.

We agree with the District Court's conclusion that the government disclosure of Zayas's statement was not delayed in a manner that prejudiced him at trial. A *Brady* violation occurs if the government does not disclose evidence favorable to the defendant that is material to either guilt or innocence, and this failure prejudices the defendant.[99] Our prejudice inquiry turns on whether the defendant received a fair trial, one resulting in a verdict worthy of confidence, in the absence of the evidence.[100] Here, there was no prejudice.

Zayas's assertion—that he believed he delivered drugs in white bags—was not new information. He raised this concern in his pro se letter seeking to withdraw his guilty plea. He also had his arrest interview statement expressing his belief that he delivered drugs in white bags. It is therefore difficult to see how failure to disclose the DEA's note referencing this same belief would have affected Zayas's trial strategy.

Moreover, Zayas cross-examined several government witnesses about this discrepancy in the color of the drug bags,

---

[98] *Brady*, 373 U.S. at 87; *see also* Fed. R. Crim. P. 16.
[99] *Bansal*, 663 F.3d at 670 ("Importantly, our 'prejudice' inquiry turns not on whether the defendant would have received a different verdict had the evidence been produced, but upon 'whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" (quoting *Strickler v. Greene*, 527 U.S. 263, 289–90, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999))).
[100] *Id.*

the fact that a blue bag containing fentanyl was found near Price's body, the references in text exchanges between Price and Dee about blue bags, and Zayas's statement that he believed he delivered white bags. During cross-examination Trooper Bachman confirmed both blue and white bags were found at the scene of Price's death. Trooper Quiroz was questioned about Dee's text message about the "blue one" and about the blue glassine baggie found near Price in her room. Additionally, Special Agent Begley was cross-examined about Zayas's post-arrest statement and about how no blue bags were found at Zayas's house during the execution of a search warrant.

To the extent that the government delayed disclosure of the DEA's note of Zayas's statement, Zayas was nevertheless able to use that information. He was clearly not prejudiced by any delayed disclosure *of his own statement* that he was well aware of, and the District Court correctly rejected his attempt to dismiss the superseding indictment on that ground.

### C.    Sentencing

Lastly, we affirm the District Court's sentencing of Zayas to two concurrent terms of life imprisonment for convictions on Counts 1 and 2.

Zayas first argues that, under the First Step Act of 2018, the District Court incorrectly applied the statutory minimum term of life imprisonment for his convictions under 21 U.S.C. § 841(b)(1)(C). The First Step Act lowered the statutory minimum sentences and substituted the predicate convictions for enhanced sentences from a "felony drug offense" to either a "serious drug felony or serious violent felony" under 21 U.S.C. § 841(b)(1)(A).[101] The Act also replaced "felony drug offense" with "serious drug felony or serious violent felony" under § 841(b)(1)(B).[102]

The Act did not make any revisions to § 841(b)(1)(C), the provision that applies to Zayas's penalty for conviction on Counts 1 and 2. The applicable text of the section states:

---

[101] First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5220.
[102] *Id.* at 5220–21.

> If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment.[103]

Zayas has two prior convictions for a felony drug offense. Therefore, the District Court did not err in sentencing Zayas to two terms of life imprisonment for convictions under Counts 1 and 2 of the indictment.

Secondly, Zayas contends that the District Court erred in adopting the Presentence Investigation Report's base level offense calculation of 43 resulting in the imposition of a term of life imprisonment. However, this argument misinterprets the sentences on Counts 1 and 2. Life sentences were statutorily required under 21 U.S.C. § 841(b)(1)(C). As discussed above, this section mandates a term of life imprisonment if the offense resulted in death and the defendant had a prior felony drug offense.

Moreover, as we have just noted, Zayas had two felony drug offenses as defined under 21 U.S.C. § 802(44). This section defines a "felony drug offense" as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, mari[j]uana, anabolic steroids, or depressant or stimulant substances."[104] Zayas's first conviction was in 1996 for distribution of a controlled substance within 1,000 feet of a school under N.J. Stat. Ann. § 2C:35-7. The second conviction was in 2009 for possession of a controlled dangerous substance under N.J. Stat. Ann. § 2C:35-10(a)(1). Both convictions are third-degree crimes punishable by terms of three to five years imprisonment.[105] Therefore, the District Court did not err in sentencing Zayas to terms of life imprisonment for conviction on Counts 1 and 2 of the superseding indictment.

---

[103] 21 U.S.C. § 841(b)(1)(C).
[104] *Id.* § 802(44).
[105] N.J. Stat. Ann. § 2C:43-6.

## III.    Conclusion

For the reasons set forth above, we will affirm the District Court's denial of relief on Zayas's challenges to the sufficiency of evidence to support guilty verdicts for distribution and conspiracy to distribute a controlled substance, distribution of a controlled substance to a pregnant individual, distribution of a controlled substance resulting in death and the imposition of terms of life imprisonment. However, we will reverse the denial of his motion for judgment of acquittal on his conviction for distribution of a controlled substance or possession with the intent to distribute a controlled substance within 1,000 feet of a playground and we will remand for further proceedings consistent with this opinion.