**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2733
_____

UNITED STATES OF AMERICA

v.

ROBERT JACKSON,
                         Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 3:20-cr-00291-001)
District Judge: Honorable Malachy E. Mannion
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on May 15, 2025

Before: SHWARTZ, MATEY, and FREEMAN, *Circuit Judges*

(Opinion filed: December 9, 2025)

_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

FREEMAN, *Circuit Judge*.

A jury convicted Robert Jackson of drug offenses resulting in the death of Joseph Sturges, and the District Court sentenced Jackson to an aggregate term of life imprisonment. For the following reasons, we will affirm the judgment.

**I**

In July 2020, Joseph Sturges was found dead on his family's property. First responders found drugs and drug paraphernalia in Sturges's immediate vicinity, including a used syringe, a prescription bottle containing Suboxone pills, and several empty baggies that previously contained drugs. Ten of those empty baggies bore a stamp with the words "Dirty Harry" and a picture of Clint Eastwood, one was stamped "Daily News," and one was unstamped.[1] Sturges's pockets contained eight pills and ten full baggies of drugs bearing the "Dirty Harry" stamp.

The police ordered testing of the pills from Sturges's pockets and the substances in the full "Dirty Harry" baggies. A lab determined that the pills were Xanax and that one of the "Dirty Harry" baggies, which the lab selected at random, contained fentanyl. The police did not send the empty baggies or the syringe for testing. (Per their safety protocols, the police photographed and destroyed the syringe rather than keeping it in evidence.)

---

[1] An additional unstamped baggie, which appeared to be old, was found in an ashtray covered with ash.

A post-mortem toxicology analysis showed that Sturges's blood contained amphetamine (25 nanograms per milliliter), methamphetamine (93 nanograms per milliliter), and fentanyl (48 nanograms per milliliter), plus metabolites of those three drugs and of Zolpidem (a prescription drug used to treat insomnia). The forensic pathologist who performed the autopsy, Rameen Starling-Roney, M.D., testified that this level of methamphetamine was "not the highest level that I've seen, but it's there," and that there was "a high level—very high level of fentanyl" in Sturges's blood. App. 155. Dr. Starling-Roney concluded, to a reasonable degree of medical certainty, that "[w]ithout the fentanyl that is noted it would be less likely of—much less that Mr. Sturges would have died at that particular moment." *Id.*

Forensic toxicologist Michael Coyer, Ph.D., opined that Sturges's level of methamphetamine was sufficient to cause impairment but still "relatively low," while the level of fentanyl in Sturges's blood was "on the upper range" of all overdose death cases he had seen. App. 265. Considering the circumstances of Sturges's death, the autopsy report, and the toxicology analysis, Dr. Coyer concluded to a reasonable degree of scientific certainty that "but for the use of fentanyl [Sturges] wouldn't have died. . . . This level of fentanyl was fatal." App. 265. He also concluded that Sturges would have died from a fentanyl overdose even without the methamphetamine in his system.

Investigators connected Sturges's drug activity to Taurie and Heather Colosi— sisters who admitted that they arranged for Sturges to buy what they thought was heroin from their supplier "Jay" three days before Sturges's death. The Colosis helped authorities set up a sting for "Jay," whom officers later identified as Jackson. When

3

Jackson arrived to deliver drugs to the Colosis, officers ordered him out of his vehicle and arrested him. While exiting his vehicle, Jackson dropped two ten-baggie bundles of fentanyl bearing the same "Dirty Harry" stamps as the baggies found on and near Sturges when he overdosed. Jackson admitted to authorities that he had arrived to deliver controlled substances to the Colosis that day, as he had done on previous occasions.

A grand jury returned an indictment charging Jackson with three counts: (1) conspiracy to distribute fentanyl, resulting in the death of the user, in violation of 21 U.S.C. § 846; (2) distribution of fentanyl, resulting in the death of the user, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and (3) possession of fentanyl with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The government filed an Information of Prior Convictions under 21 U.S.C. § 851, listing Jackson's four prior felony drug convictions.

During jury selection for Jackson's trial, the government exercised a peremptory strike on prospective juror 33 ("PJ-33"). Jackson objected, arguing that the strike was discriminatory and violated *Batson v. Kentucky*, 476 U.S. 79 (1986), so the prosecutor provided race-neutral reasons for the strike. The prosecutor said she struck PJ-33 because he was twenty-one years old, had no life experience, and was not showing respect for the dignity of the Court. She added, "He didn't answer any questions. I don't know if he's smoking pot every night." App. 125. Defense counsel asked the prosecutor to agree that PJ-33 was "a person of color." App. 125. The prosecutor replied that she "didn't look at him" and could not tell if he was a person of color, but that she "would strike anyone who is 21 years old in a case like this." *Id.*

4

The District Court denied the *Batson* challenge. It found that PJ-33 did not answer any questions, was 21 years old, and was wearing a hat in the courtroom, supporting the prosecutor's perception of disrespect.

The jury convicted Jackson on all counts. With respect to Counts 1 and 2, it found that Sturges's death resulted from the use of fentanyl distributed by Jackson.

Before sentencing, Jackson moved to dismiss the Information of Prior Convictions, arguing that his prior convictions did not trigger a mandatory sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(C). The District Court denied the motion, concluding that Jackson's prior convictions did require a mandatory life sentence on Counts 1 and 2. It sentenced Jackson to concurrent terms of imprisonment: life on Counts 1 and 2, and 360 months on Count 3. This timely appeal followed.

**II**[2]

Jackson raises three issues on appeal: his *Batson* challenge, an unpreserved challenge to the death-results jury instruction, and an argument that his mandatory life sentence is illegal. We consider each in turn.

---

[2] The District Court had subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

A

Jackson argues that the government struck PJ-33 on the basis of racial or ethnic animus, violating *Batson*.[3] Apparently agreeing that the District Court properly applied *Batson*'s legal framework, Jackson only argues that the District Court clearly erred when it accepted the race-neutral reasons the prosecutor gave to explain the strike.

A district court's factual finding that a prosecutor was not motivated by discrimination is "accorded great deference on appeal" because the finding largely turns on credibility. *United States v. Savage*, 970 F.3d 217, 267 (3d Cir. 2020) (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

---

[3] Jackson alleges that PJ-33 was "Latinx," Appellant's Br. 16, but the District Court did not make a factual finding about PJ-33's race or ethnicity. Normally, the District Court would make that finding at the first step of *Batson*'s three-step inquiry. *See Rice v. Collins*, 546 U.S. 333, 338 (2006) ("First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. . . . Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." (citations omitted)). Here, however, the prosecutor explained her reasons for striking PJ-33 without prompting from the District Court, so the first step became moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

Jackson also alleges that there were three persons of color among the 37 potential jurors who remained after strikes for hardship and cause. But there was no fact-finding in that regard, either, and Jackson points to nothing in the record except defense counsel's remark to the trial court that PJ-33 was "one [] person of color, *probably* one of three on the panel. . . . There aren't that many out of 37 in the room right now." (emphasis added)). App. 124. Nonetheless, we need not remand for factual findings because these facts would not alter our disposition of Jackson's appeal.

Here, Jackson argues that the prosecutor's race-neutral reasons were implausible and belied by the record. He makes five points to support this argument: (1) the prosecutor's comment about how PJ-33 may be smoking pot every night was motivated by discriminatory animus, as PJ-33 gave no affirmative response when the District Court asked whether any potential jurors had experience using or possessing illegal drugs; (2) it was not plausible for the prosecutor to have not looked at PJ-33 but also to have stricken him based on his demeanor; (3) PJ-33 showed no disrespect when he wore a hat he had not been told to remove; (4) seated jurors were similar to PJ-33: one was 26 years old, and another answered no questions during group voir dire; and (5) the case had racial overtones.

All of Jackson's points challenge the District Court's choice to credit the prosecutor's statements that she was unaware of PJ-33's race or ethnicity when she struck him for cause. But the District Court made a factual finding that the prosecutor only looked at PJ-33 enough to note his hat. App. 125 ("[T]he government indicates that except seeing his hat they didn't look at them. I have no reason to disbelieve their proffer in that regard."). It also found that PJ-33's hat supported the prosecutor's perception of disrespect. App. 125 ("The government proffered that . . . he's wearing a hat in the courtroom, which I can understand them believing that is disrespectful."). These findings were not clearly erroneous. Further, the District Court was in the best position to evaluate all the circumstances bearing on the prosecutor's race-neutral explanation for striking PJ-33. Jackson now presents a different view of those circumstances, but the one the District Court chose was not clearly erroneous.

7

B

For the first time on appeal, Jackson argues that the District Court gave erroneous jury instructions for the death-results element of Counts 1 and 2. We review this unpreserved claim for plain error, *United States v. Stevens*, 70 F.4th 653, 656–57 (3d Cir. 2023), and we discern none.

The death-results element enhances the statutory penalties for Counts 1 and 2. *See* 21 U.S.C. § 841(b)(1)(C). This sentencing enhancement applies only when the victim's use of the drug the defendant distributed was the but-for cause of the victim's death. *Burrage v. United States*, 571 U.S. 204, 211 (2014) (explaining that an event "results from" a cause within the meaning of § 841(b)(1)(C) where the cause "is an antecedent but for which the result in question would not have occurred." (internal quotation marks omitted)).

The District Court instructed the jury that, to convict on Count 2, it must find that Sturges's use of the fentanyl Jackson distributed "was a cause without which the death of Joseph Sturges on July 28, 2020 would not have occurred." App. 317. Jackson contends that this instruction permitted jurors to find the death-results element was satisfied by something less than but-for causation. We disagree. By requiring the jury to find the fentanyl Jackson distributed was a cause without which the victim would have lived, the instruction required but-for causation. *See Burrage*, 571 U.S. at 211 ("[I]f poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.").

8

The District Court's instructions for Count 1 (conspiracy) included only the elements of the conspiracy offense—not the elements of the underlying distribution offense. That was not erroneous, as the object of the conspiracy was separately charged in Count 2 of the indictment and the District Court separately (and correctly) instructed the jury on the elements of Count 2. *See* 3d Cir. Model Criminal Jury Instructions, § 6.18.371A (2021); *United States v. Bansal*, 663 F.3d 634, 669 (3d Cir. 2011).

C

Finally, Jackson argues the District Court erred in imposing a mandatory life sentence on Counts 1 and 2 based on a qualifying prior conviction. We review this legal question de novo. *See United States v. Henderson*, 841 F.3d 623, 626 (3d Cir. 2016).

Because the jury convicted Jackson on Counts 1 and 2 and found that the government proved the death-results element, Jackson was subject to a mandatory sentence of life imprisonment if he had "a prior conviction for a felony drug offense."[4] 21 U.S.C. § 841(b)(1)(C). Absent a qualifying prior conviction, he was subject to a sentencing range of 20 years to life imprisonment. *Id.*

Jackson urges us not to apply the term "felony drug offense" in § 841(b)(1)(**C**) (the provision governing his convictions) because that term does not appear in

---

[4] Contrary to Jackson's argument, a jury need not making findings concerning a defendant's prior convictions for felony drug offenses for purposes of 21 U.S.C. § 841(b)(1)(C). *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)).

§§ 841(b)(1)(**A**) and 841(b)(1)(**B**). In the First Step Act of 2018, Congress replaced "felony drug offense" with the term "serious drug felony or serious violent felony" in §§ 841(b)(1)(A) and 841(b)(1)(B), but it did not make that revision to § 841(b)(1)(C). *See United States v. Zayas*, 32 F.4th 211, 230–31 (3d Cir. 2022). Jackson contends that the First Step Act resulted in nonuniformity that prevents us from applying the language of § 841(b)(1)(C). But in *United States v. Zayas*, we applied the language of § 841(b)(1)(C) when that provision (rather than §§ 841(b)(1)(A) or 841(b)(1)(B)) governed the defendant's conviction. *Id.* That holding in *Zayas* binds us here, despite Jackson's arguments to the contrary.

In *Zayas*, we held that the defendant's convictions under two New Jersey statutes—N.J. Stat. Ann. § 2C:35-7 (governing distribution of a controlled substance within 1,000 feet of a school) and N.J. Stat. Ann. § 2C:35-10(a)(1) (governing possession of a controlled dangerous substance)—triggered the § 841(b)(1)(C) sentencing enhancement. *Id.* at 230–31. Because Jackson had prior convictions for violating those same New Jersey statutes when he committed the offenses charged in Counts 1 and 2, the government argues that *Zayas* requires us to affirm Jackson's mandatory life sentences. But Jackson points out that the parties to *Zayas* did not argue (and we did not address) whether either of those New Jersey statutes penalizes more conduct than "a felony drug offense" as that term is used in 21 U.S.C. § 841(b)(1)(C). So we will assume that our statement in *Zayas* is not binding precedent on the overbreadth question. *See United States v. Bennett*, 100 F.3d 1105, 1110 (3d Cir. 1996).

Nonetheless, we conclude that Jackson has at least one prior conviction for a "felony drug offense" that triggers the § 841(b)(1)(C) enhancement. To determine whether his prior convictions qualify, we apply the categorical approach. *United States v. Aviles*, 938 F.3d 503, 511 (3d Cir. 2019). And we will assume without deciding that two of Jackson's prior convictions—those for third-degree manufacture, distribution, or possession with intent to manufacture or distribute "a controlled dangerous substance or controlled substance analog," in violation of N.J. Stat. Ann. § 2C:35-5(a)(1), (b)(3) (eff. Nov. 1, 2000, to Feb. 22, 2021) ("Section 35-5")—were for violating indivisible statutes that encompass controlled substance analogs. Even under this assumption, Jackson's Section 35-5 convictions trigger the § 841(b)(1)(C) enhancement.

Jackson contends that, because Section 35-5 proscribes conduct relating to cocaine analogs and heroin analogs, his Section 35-5 convictions do not qualify as "felony drug offenses." We disagree.

"The term 'felony drug offense' means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to *narcotic drugs*, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44) (emphasis added). In turn, "narcotic drug" is defined to include numerous substances, including "opiates." *Id.* § 802(17)(A). And an "opiate" is defined as "any drug or other substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining liability." *Id.* § 802(18).

11

The heroin analogs that qualify for Section 35-5 convictions satisfy the definition of "opiates." Under New Jersey law, a heroin analog is a substance "that has a chemical structure substantially similar" to heroin and that was "specifically designed to produce an effect substantially similar to" heroin. N.J. Stat. Ann. § 2C:35-2. Thus, a heroin analog has "an addiction-forming or addiction-sustaining liability similar to morphine" or is capable of conversion into a substance that does, so it is an "opiate." 21 U.S.C. § 802(18); *see also* 21 C.F.R. § 1300.01(b) (referring to heroin as a "morphine-like drug"). That means it is also a "narcotic drug" under federal law. And offenses prohibiting conduct relating to "narcotic drugs" qualify as "felony drug offenses."

Turning to cocaine analogs, Jackson relies on one particular analog—ioflupane—to argue that his Section 35-5 convictions do qualify as "felony drug offenses." Ioflupane is "derived from cocaine via ecgonine" and was removed from the federal Controlled Substances Act schedules in 2015. Removal of Ioflupane from Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54715-01, 2015 WL 5265212 (Sept. 11, 2015). But ioflupane's removal from those schedules does not affect the statutory definitions that govern Jackson's sentencing enhancement. The term "narcotic drug" is defined to include "[a]ny compound, mixture, or preparation" containing "*[e]cgonine, its derivatives*, their salts, isomers, and salts of isomers." 21 U.S.C. § 802(17)(E) (emphasis added). Therefore, as an ecgonine derivative, ioflupane is a "narcotic drug," and Jackson's challenge cannot succeed.

Because Jackson has at least one prior conviction for a felony drug offense, his mandatory life sentences are lawful.

12

\*     \*     \*

For the reasons set forth above, we will affirm the judgment.